The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Lisl E. AUMAN, Defendant–Appellant.

No. 99CA0016.

Colorado Court of Appeals,
Div. II.

Sept. 26, 2002.

As Modified on Denial of Rehearing
Nov. 14, 2002.

Certiorari Granted March 24, 2003.*

* Justice RICE and Justice COATS do not partici-    pate.

Ken Salazar, Attorney General, Paul Koehler, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Kathleen A. Lord, Chief Appellate Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Peter A. Weir, Executive Director, Colorado District Attorneys' Council, Denver, Colorado; Steven L. Bernard, Assistant District Attorney, Brighton, Colorado, for Amicus Curiae Colorado District Attorneys' Council.

Haddon, Morgan & Foreman, P.C., Norman R. Mueller, Rachel Bellis, Denver, Colorado, for Amicus Curiae National Association of Criminal Defense Lawyers.

Opinion by Judge WEBB.

In this case primarily challenging the breadth of Colorado's felony murder statute, defendant, Lisl E. Auman, appeals the judgment of conviction entered on jury verdicts finding her guilty of felony murder, second degree burglary, menacing, and conspiracy to commit first degree burglary. We affirm.

Defendant formerly lived at a rooming house known as the "Lodge," in Buffalo Creek, Colorado. Each resident had his or her own room. Defendant had dated another resident of the Lodge (boyfriend), spent time

in his room, and kept some of her belongings there.

Defendant broke off her relationship with boyfriend, moved out of the Lodge, and visited a girlfriend at her condominium in Denver. They decided to transfer defendant's belongings from the Lodge to the condominium.

Mattheus Jaehnig and his male friend stopped by the condominium the night before the critical events. According to defendant's statements to police, which were admitted into evidence, she told these two men and girlfriend's live-in boyfriend (D.G.) that she felt ill-treated by boyfriend and wanted to "retaliate." The three men agreed to accompany defendant to the Lodge.

Defendant told police she feared the men might hurt boyfriend if he were there and asked D.G. not to kill him. She said D.G. responded he could not make any promises.

Defendant also told police one of the men inquired about boyfriend's possessions and she responded that boyfriend had two large stereo speakers. She said the group decided to go to the Lodge the following day when fewer people would be present. In statements that were presented during trial, defendant, girlfriend, and D.G. all told police they had not planned to take anything other than defendant's belongings.

Around noon the next day, defendant led the group to the Lodge. Defendant rode in a stolen Trans Am driven by Jaehnig. The others followed in girlfriend's car. Jaehnig had a shotgun and two assault rifles in the Trans Am. Defendant told police she did not know Jaehnig was armed when she rode with him to the Lodge.

Defendant told police that upon arrival at the Lodge, Jaehnig stayed with the cars as the "lookout," while defendant and girlfriend went into defendant's room and began gathering her belongings. Defendant then led D.G. and girlfriend to boyfriend's room.

Bolt cutters were used to cut a padlock on boyfriend's door, although who actually did this is unclear. Girlfriend testified that after the padlock had been cut, defendant handed bolt cutters to her. D.G. testified that Jaehnig carried bolt cutters and other tools in the Trans Am.

Defendant, D.G., and the other man entered boyfriend's room. Several items belonging to him were taken, including the two stereo speakers. His ownership of other items taken was disputed, but defendant told police she saw boyfriend's property taken.

While defendant was in boyfriend's room, a resident of the Lodge asked, "Are you taking [boyfriend's] stuff?" Any wrongdoing was denied. However, this resident became suspicious and wrote down the license plate numbers of the two cars.

Various items from both rooms were loaded into the two cars. Defendant and Jaehnig then left in the Trans Am, with Jaehnig again driving. The others drove off in girlfriend's car in the opposite direction. Shortly thereafter, residents of the Lodge called 911, reported a crime, and gave the license numbers.

About ten miles from the Lodge, deputies began following the Trans Am toward Denver and turned on their overhead lights. When Jaehnig did not stop, a high-speed chase ensued. Defendant told police she was very frightened during the chase and asked Jaehnig to stop several times, but he continued into Denver.

Traffic caused the Trans Am to stop near a suburban shopping center. Defendant did not attempt to get out, and the Trans Am sped away. The deputies broke off and then resumed pursuit.

While defendant briefly held the steering wheel, Jaehnig leaned out the car window and shot at the pursuing deputies. Defendant explained to police that Jaehnig told her to take the wheel, but did not threaten her or force her to do so. Defendant also said she steered the car so it would not go off the road and likely kill her.

As the chase continued, the Trans Am struck another car and again briefly came to a complete stop. Defendant told police she did not then attempt to get out of the car because she was afraid of Jaehnig and he had told her, "Don't even think about it."

Jaehnig and defendant reached girlfriend's condominium and went into an alcove outside the entrance. Police officers approached and made several demands for surrender. Defendant stepped out of the alcove. Jaehnig disappeared from the officers' sight.

Officers grabbed defendant, forced her to the ground, and handcuffed her. They repeatedly asked her where Jaehnig had gone. Defendant responded that she did not know what they were talking about. The officers then put defendant in a squad car.

Approximately five minutes later, a police officer looked around the corner of the alcove. Jaehnig shot and killed the officer. A gun battle then broke out. After exhausting his ammunition, Jaehnig killed himself with the deceased officer's pistol.

An autopsy revealed high levels of methamphetamines in Jaehnig's system. According to a defense expert at trial, the drug would have made Jaehnig paranoid, violent, and irresponsible.

At police headquarters, defendant consented to a videotaped interview. A few hours later, she agreed to a second videotaped interview, during which she admitted lying to police in the first interview and then described the events differently. Both videotapes were played to the jury.

As relevant here, defendant was charged with first degree felony murder, attempted first degree murder, first degree assault, menacing, first degree burglary, conspiracy to commit first degree burglary, and second degree burglary.

At the request of the People, the second degree burglary count was dismissed the day jury selection began. At defendant's request, however, the court instructed the jury on second degree burglary as a lesser included offense.

The jury found defendant guilty of felony murder, second degree burglary, menacing, and conspiracy to commit first degree burglary.

## I. The Information

■ Defendant first asserts the information charging her with felony murder did not provide adequate notice of the predicate felony, burglary, and therefore the trial court lacked jurisdiction. We do not agree.

The information charged defendant with felony murder in count one as follows:

> On or about the 12th day of November, A.D.1997, at the City and County of Denver, State of Colorado, Lisl E. Auman, did unlawfully and feloniously, acting alone and with one or more persons, commit and attempt to commit the felony of Burglary; and, in the course of and in furtherance of said crime that defendant was committing and attempting to commit, and in immediate flight therefrom, the death of a person other than one of the participants, namely [the deceased officer] was caused....

Two other counts of the information separately charged defendant with first degree burglary and second degree burglary. Both counts described the same incident, but the first degree count also alleged use of a deadly weapon, assault, and menacing in connection with the burglary or flight therefrom. Before trial, defendant did not challenge the information.

■ When faced with a challenge to an information, courts consider defects in both substance and form. A substantive defect "renders void any conviction entered on such charge." *People v. Williams*, 984 P.2d 56, 64 (Colo.1999). However, an information generally will be deemed adequate in substance if it tracks the language of the pertinent statutes as to essential elements. *People v. Williams, supra.*

The language in count one follows the language of the felony murder statute, which lists "burglary" among the predicate felonies. *See* Colo. Sess. Laws 1988, ch. 124, § 18–3–102(1)(b) at 712 (version applicable to defendant's offense). Therefore, the information was substantively sufficient and conferred jurisdiction on the trial court. *See People v. Richardson*, 58 P.3d 1039 (Colo.App.2002).

■ The failure to specify an underlying offense is a defect in form. *People v. Richardson, supra.* "Objections to the form of an information must be made before trial or they are waived." *People v. Williams, supra*, 984 P.2d at 64. Nevertheless, a defect

in the form of an information may render a conviction void if the defect substantially prejudices rights of the defendant. *People v. Richardson, supra.* When determining whether a defect in form caused prejudice, courts consider the surrounding circumstances, including the context provided by other counts in the information. *People v. Williams,* 23 P.3d 1229 (Colo.App. 2000)(*Williams II* ).

■ Although defendant now claims lack of specificity as to which burglary count was the predicate offense for felony murder hindered her trial preparation, she did not seek a bill of particulars. Moreover, throughout the pretrial phase other counts made clear to her that the two charged burglaries involved exactly the same incident.

■ Defendant also contends she received inadequate notice that during trial second degree burglary could become the basis for her felony murder conviction. However, second degree burglary was originally charged, and, after that charge had been dismissed, defendant requested it be submitted to the jury as a lesser included offense. *Cf. Williams II, supra* (When a lesser nonincluded offense instruction is requested by the defense, the information is thereby deemed amended to include that charge).

Accordingly, we conclude the absence of an allegation in the information specifying which burglary count constituted the predicate offense to felony murder could not have prejudiced defendant.

## II.  Felony Murder

The primary focus of defendant's appeal alleges various errors concerning interpretation of the felony murder statute, related jury instructions, and evidence. We find no reversible error.

### A.  Statutory Construction

Defendant first argues the felony murder statute should be interpreted as limited to *her* immediate flight, which she further contends necessarily ended upon her arrest. We disagree with her proposed interpretation.

Our fundamental responsibility when interpreting a statute is to give effect to the language used by the General Assembly. If the statutory language unambiguously sets forth the legislative purpose, we end our inquiry. *Reg'l Transp. Dist. v. Lopez,* 916 P.2d 1187 (Colo.1996). Conversely, if this language does not clearly establish the General Assembly's purpose, then we may determine its meaning from extrinsic sources. Section 2–4–203, C.R.S.2002; *Pierson v. Black Canyon Aggregates, Inc.,* 48 P.3d 1215 (Colo.2002).

Defendant asserts "an individual's liability under the statute is terminated if the individual is no longer 'committing' the [predicate] felony or is no longer in immediate flight from the felony she 'is committing.' " No Colorado case has addressed this question, and we are not persuaded by defendant's argument.

■ In our view, the first prong of defendant's argument mistakenly equates termination of the predicate felony that "[s]he is committing" with immediate flight, which is not so restricted. *See People v. Gladman,* 41 N.Y.2d 123, 128, 390 N.Y.S.2d 912, 359 N.E.2d 420, 424 (1976)(addition to felony murder statute of "immediate flight" was "intended to do away with many of the old technical distinctions relating to 'abandonment' or 'completion' " of the predicate felony); *cf. People v. Renaud,* 942 P.2d 1253 (Colo.App.1996)(in flight cases, the predicate felony may have been completed).

■ The second prong of this argument goes against the statutory language, in which we find no ambiguity. Had the General Assembly intended to restrict "immediate flight" to conduct of the defendant, it could have used the phrase, "or of his or her immediate flight therefrom."

Under the applicable version of § 18–3–102(1)(b), a person commits felony murder if, acting alone or with others, "[s]he commits or attempts to commit" a listed predicate felony and "in the course of or in furtherance of the crime that [s]he is committing or attempting to commit, or of immediate flight therefrom, the death of a [nonparticipant] is caused by anyone."

The phrase "[s]he commits or attempts" precedes the list of predicate felonies. In addition, the phrase "[s]he is committing or attempting to commit" modifies the requirement of "in the course of or in furtherance of the crime." The following phrase, "immediate flight therefrom," is set off by commas and is not restricted to a defendant's own immediate flight.

■■■ When the legislature uses certain language in one part of a statute and different language in another part, a court should assume that different meanings are intended. Every word excluded from a statute must be presumed to have been excluded for a reason. 2A Norman J. Singer, *Sutherland Statutory Construction* § 46.06 (6th ed.2000); *see also People v. J.J.H.*, 17 P.3d 159 (Colo. 2001)(courts should not presume the General Assembly used language idly).

■■ Moreover, a predicate felony committed by multiple participants can give rise to separate paths of "immediate flight," any one of which could lead to "the death of a person." Even if a defendant took a completely separate path from the flight that caused the death, the phrase "caused by anyone" indicates the defendant would still be culpable.

Thus, the statute reflects a policy judgment that persons who engage in certain dangerous crimes which result in death "will be punished in accordance with the serious results of that conduct, even if the death was an unintended consequence." *People v. Griffin*, 867 P.2d 27, 35 (Colo.App.1993)(Rothenberg, J., dissenting in part and concurring in part). This broad purpose further weighs against defendant's interpretation.

Hence, we reject defendant's interpretation of the statute. Nevertheless, some of defendant's remaining arguments concerning felony murder require analysis independent of her interpretation, and we address them accordingly.

B. Precedent from Other Jurisdictions

■■ Noting the absence of any Colorado felony murder case involving a killing after the defendant's arrest, defendant urges us to follow out-of-state authority stating that felony murder liability terminates upon a defendant's arrest. We decline to do so.

Courts in other jurisdictions have employed three analytical approaches to resolving this question, which we examine separately. For reasons discussed below, we conclude a totality of circumstances approach rather than a categorical rule is required to determine when felony murder liability terminates.

Under the first approach, arrest terminates liability. However, the five cases on which defendant relies include very little analysis of this issue. *See Coleman v. United States*, 295 F.2d 555 (D.C.Cir.1961)(arrest would break essential link between robbery and killing); *Collier v. State*, 244 Ga. 553, 261 S.E.2d 364 (1979)(underlying felony terminates for purpose of felony murder rule once perpetrator arrested), *overruled in part by Thompson v. State*, 263 Ga. 23, 426 S.E.2d 895 (1993), *and Satterfield v. State*, 248 Ga. 538, 285 S.E.2d 3 (1981); *People v. Smith*, 232 N.Y. 239, 133 N.E. 574 (1921)(capture of defendant by victim could have terminated predicate crime); *State v. Milam*, 108 Ohio App. 254, 156 N.E.2d 840 (1959)(complicitors who later killed officer may have commenced entirely new criminal episode upon arrest of defendant); *Simonds v. State*, 762 P.2d 1189 (Wyo.1988)(whether arrest of defendant occurred is critical to continuity of burglary in prosecution for aggravated burglary based on assault following arrest).

Under the second approach, courts emphasize the particular circumstances of capture, surrender, or arrest. *See People v. Nichols*, 230 N.Y. 221, 229, 129 N.E. 883, 885–86 (1921)("[T]here must be some appreciable interval between the alleged abandonment and the [killing].... The process of detachment must ... give his co-conspirators a reasonable opportunity, if they desire, to follow his example...."); *Commonwealth v. Doris*, 287 Pa. 547, 552, 135 A. 313, 315 (1926)(an effective withdrawal must be the defendant's "voluntary act" and occur before the death at issue "has become so imminent that its avoidance is practically out of the question").

Under the third approach, courts have upheld convictions even though the killing fol-

lowed the defendant's arrest. *See, e.g., State v. Hitchcock,* 87 Ariz. 277, 350 P.2d 681 (1960)(no appreciable span of time between defendant's allegedly being subdued and killing); *State v. Lopez,* 173 Ariz. 552, 845 P.2d 478 (Ct.App.1992)(jury could find defendant guilty of felony murder although handcuffed or ordered to lie on ground, if he was still the proximate cause of death); *People v. Mitchell,* 61 Cal.2d 353, 38 Cal.Rptr. 726, 392 P.2d 526 (1964)(attempt to surrender not intervening act); *McFarlane v. State,* 593 So.2d 305 (Fla.Dist.Ct.App.1992)(defendant's surrender to police did not relieve him of criminal liability for death of accomplice); *State v. Hokenson,* 96 Idaho 283, 527 P.2d 487 (1974)(defendant's arrest did not absolve him of culpability for death caused when his bomb later exploded); *cf. Campbell v. State,* 227 So.2d 873 (Fla.1969)(arrest followed by escape); *State v. Sophophone,* 270 Kan. 703, 19 P.3d 70, 72 (2001)("This 'intervening cause' or 'break in circumstances' argument has no merit under the facts of this case.")(dictum).

We discern no clear majority rule. However, several factors limit the value to our inquiry of the cases using the first approach.

In *Coleman,* the government contested the occurrence of an arrest, but did not dispute that a completed arrest would end liability. The felony murder statutes in *Coleman, Collier,* and *Smith* did not include a flight term. In *Milam,* the only one of these cases that, as here, involved a killing by an accomplice, the court recognized as an issue for the trier of fact on remand whether the defendant's arrest terminated the predicate crime, which is similar to our conclusion reached below.

In contrast, the third approach employs causation principles that also appear in the Colorado felony murder cases discussed below, such as "part of the same transaction," *Campbell v. State, supra,* 227 So.2d at 878; "chain of events," *McFarlane v. State, supra,* 593 So.2d at 306; "res gestae," *People v. Mitchell, supra,* 38 Cal.Rptr. 726, 392 P.2d at 532; and "natural and probable consequences," *State v. Hokenson, supra,* 527 P.2d at 492.

█ In our view, causation remains the dispositive issue despite defendant's arrest.

*See Hamrick v. People,* 624 P.2d 1320, 1324 (Colo.1981)(issue was whether defendant initiated a "chain of events which in their natural and probable consequences caused the victim's death").

Where, as here, a confederate causes the death, numerous Colorado felony murder cases recognize the culpability of a defendant who was not directly involved in the killing. *See, e.g., People v. Fisher,* 9 P.3d 1189 (Colo. App.2000). The supreme court has explained the underlying principle in causation terms: "Each [defendant], therefore, is responsible for the act of his confederates which was the probable and natural consequence of the execution of the common design, even though it was not originally intended." *Andrews v. People,* 33 Colo. 193, 202, 79 P. 1031, 1035 (1905). Similarly, "[w]hen the homicide is within the res gestae of the initial crime and is an emanation thereof, it is committed in the perpetration of that crime within the meaning of the statute, and all participants are liable." *Bizup v. People,* 150 Colo. 214, 218, 371 P.2d 786, 788 (1962); *see also People v. McCrary,* 190 Colo. 538, 549 P.2d 1320 (1976).

█ Consequently, Colorado law places causation in the hands of the jury if the evidence permits a reasonable inference that "the death took place during the same transaction as the felony." *People v. Urrutia,* 893 P.2d 1338, 1348 (Colo.App.1994)(citing *Bizup* and noting "other jurisdictions have determined that whether the underlying felony was completed, terminated, or abandoned, is ordinarily a question of fact for the jury"); *see also People v. Renaud, supra.*

Moreover, in rejecting the argument that a defendant's alleged surrender completed the predicate felony prior to the killing, and therefore precluded felony murder culpability, the division in *People v. Renaud, supra,* 942 P.2d at 1257, noted "courts from other jurisdictions have rejected similar arguments that an alleged withdrawal or surrender served to terminate the underlying felony for purposes of the felony murder statute," citing with approval *People v. Mitchell, supra.* For present purposes, we see no difference among withdrawal, surrender, and arrest.

Finally, we cannot accept defendant's position that her arrest before the killing necessarily precludes culpability when the threshold inculpatory event is intent to commit the underlying felony, not intent to kill. *Whitman v. People*, 161 Colo. 110, 420 P.2d 416 (1966); *see also Early v. People*, 142 Colo. 462, 352 P.2d 112 (1960)(holding definition of felony murder as murder in the first degree constitutional, despite lack of specific intent to kill). Here, defendant's arrest, hours after commission of the predicate felony, does not revoke her intent to commit that crime.

Thus, in light of these Colorado cases, and independent of our earlier conclusion that the felony murder statute permits inquiry beyond the termination of defendant's own immediate flight, the authorities cited by defendant do not persuade us that a defendant's arrest necessarily precludes the jury from considering his or her culpability for a later killing.

Hence, we turn to the second and third approaches as providing a framework for applying Colorado's "natural and probable consequence" standard of causation to determine whether, despite a defendant's arrest, other facts still present a jury question. The categorical rule in the first line of cases would foreclose this analysis without offering a well-reasoned basis for doing so.

Here, after Jaehnig fired at pursuing deputies while defendant steered the Trans Am, the chase continued. *See People v. Mitchell*, *supra*, 38 Cal.Rptr. 726, 392 P.2d at 532 (defendant "created the explosive and dangerous situation"). Defendant's arrest resulted from extended pursuit, not her unilateral surrender. *See Commonwealth v. Doris*, *supra*, 287 Pa. at 552, 135 A. at 315 ("the withdrawal must have been his voluntary act"). The killing of the officer by Jaehnig closely followed defendant's arrest. *See State v. Hitchcock*, *supra*, 350 P.2d at 683 (events leading to victim's death "occurred in rapid sequence").

In sum, under causation principles recognized by Colorado law, the totality of circumstances at the point of defendant's arrest could give rise to a reasonable inference that the risk of further violence had become "so inevitable that it cannot reasonably be stayed." *See People v. Nichols*, *supra*, 230 N.Y. at 229, 129 N.E. at 885. And we can discern no principled basis for holding that defendant's surrender and arrest, in light of her dissembling to officers immediately thereafter, should conclusively relieve defendant from the further consequences of Jaehnig's ongoing conduct.

Accordingly, we conclude the trial court correctly gave the causation issue to the jury, rather than impose a bright line arrest rule as a matter of law.

### C. Defendant's Tendered Immediate Flight Instruction

Defendant asserts the trial court erred in refusing to give the following instruction she tendered concerning "immediate flight":

Immediate Flight means that no intervening event had broken the continuity of the underlying crime; a person is not in the immediate flight from a burglary if an entirely new episode of events has begun; nor is a person in immediate flight if she has reached a point of temporary safety or is subject to complete custody at the time the death is caused.

The factors to be considered in determining whether the burglary was still in progress or had been terminated by intervening events are as follows:

1. Whether the location of the burglary was the same as that where the death was caused

2. The distance between the locations

3. The interval of time between the burglary and the death

4. Whether the defendant still possessed the fruits of the burglary at the time the death was caused

5. The causal relationship between the underlying felony and the causation of death

6. Whether the co-perpetrator of the burglary had committed intervening acts which weakened any causal connection between the burglary and the death

7. Whether the death was too dependent on another person's volitional act to have just bearing on the defendant's culpability

8. Whether the police were in close pursuit of the defendant at the time the death was caused

9. Whether the defendant had reached a place of temporary safety or was in complete custody at the time the death was caused.

We are not persuaded.

Appellate courts generally review the denial of a tendered jury instruction for abuse of discretion. *People v. Ross,* 179 Colo. 293, 500 P.2d 127 (1972).

### 1.

Defendant first asserts "immediate flight" should have been defined, citing *People v. Gladman, supra,* which used several of the factors set forth in her proposed instruction. We disagree.

No Colorado case requires an explanatory instruction on immediate flight. Nor does such an instruction appear in CJI–Crim. The felony murder statute does not contain a definition of "immediate flight."

These are words of common meaning, not a legal term of art, which weighs against defining them in a separate instruction. *See People v. Dore,* 997 P.2d 1214 (Colo.App. 1999). We note that the trial court also rejected an instruction defining "immediate flight" tendered by the People.

Moreover, defendant's tendered instruction indicated that she was not guilty solely because she had been arrested before the officer's death. Thus, the instruction would have improperly interfered with the jury's function to determine the weight of the evidence. *See People v. Mandez,* 997 P.2d 1254 (Colo.App.1999).

Indeed, we have held that Colorado law does not support a categorical limitation on felony murder culpability once a defendant "is subject to complete custody," which appears twice in the proposed instruction. *See People v. Mandez, supra* (jury instructions must accurately state law).

Finally, in closing defendant argued to the jury, without objection, several of the factors from her tendered instruction, including her arrest before the officer's death and Jaehnig's own reasons for evading capture.

Thus, the trial court did not abuse its discretion in refusing defendant's definition of "immediate flight."

### 2.

■■■ Defendant next argues this instruction should have been given because it explains "the causal relationship between the underlying felony and the causation of death." We disagree.

■■■ The felony murder statute does not include any particular standard of causation. Nor does any Colorado felony murder case demand a narrow approach. *Andrews v. People, supra.* We perceive no need to define causation beyond the elemental instruction that included the statutory language.

### 3.

■■■ Defendant further argues this instruction should have been given because it specifically addressed Jaehnig's supposed "intervening acts" in the chase and shooting. Defendant contends the criminal law must distinguish between "but for" cause and legal or proximate cause, and therefore she was entitled to an independent intervening cause instruction under *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316 (1975). We do not agree.

Colorado criminal law recognizes the narrower concept of proximate cause by allowing an intervening cause instruction based on evidence of "an independent intervening cause *in which the accused does not participate,* and which [she] could not foresee." *People v. Calvaresi, supra,* 188 Colo. at 283, 534 P.2d at 319 (quoting 1 *Wharton's Crim. Law & Pro.* § 200, at 448 (12th ed.1957))(emphasis supplied); *accord People v. Saavedra–Rodriguez,* 971 P.2d 223 (Colo.1998).

Defendant ignores the evidence of her planning, execution, and flight with Jaehnig from the burglary, which defeats the require-

ment that she "not participate." *See People v. Bowman,* 669 P.2d 1369 (Colo.1983).

4.

■ Defendant argues the trial court was obligated to give this instruction because it embodied her theory of defense. We disagree.

■ An instruction that embodies a defendant's theory of defense *"must be given* by the trial court if the record contains any evidence to support the theory," *People v. Nunez,* 841 P.2d 261, 264 (Colo.1992), even if the theory is improbable or unreasonable. *People v. Moya,* 182 Colo. 290, 512 P.2d 1155 (1973).

During the instruction conference, however, defendant did not assert her right to a theory of defense instruction as the basis for giving this instruction. Another instruction advised the jury, "The Defendant has pleaded Not Guilty."

■ In our view, appellate argument for an instruction on a basis not raised in the trial court is the equivalent of asserting on appeal an evidentiary objection different from the objection raised at trial. *Cf.* Crim. P. 52(b); *Wilson v. People,* 743 P.2d 415 (Colo.1987). Hence, we review this contention for plain error. *See People v. Fisher, supra.*

■ Here, evidence supported defendant's theory that Jaehnig fled for his own reasons and that she was in complete custody when he killed the officer.

■ Nevertheless, a theory of defense instruction "must be brief, general, and must instruct the jury on the legal effect of the explanation." *People v. Weiss,* 717 P.2d 511, 512 (Colo.App.1985); *see, e.g., People v. Nunez, supra* (alibi). A trial court may refuse a theory of defense instruction that "simply calls attention to specific points of evidence," *People v. Inman,* 950 P.2d 640, 645 (Colo. App.1997), or is "merely another attempt to reargue the case." *Marn v. People,* 175 Colo. 242, 248, 486 P.2d 424, 427 (1971).

The first paragraph in defendant's instruction "tends to be argumentative rather than instructive." *See People v. Inman, supra,*

950 P.2d at 645. The many succeeding subparagraphs unduly emphasize specific points of evidence. And we agree with the trial court's conclusion that limitations on causation in the instruction are more restrictive than the felony murder statute. *Cf. People v. Inman, supra* (tendered theory of defense instruction relied on inapplicable statutory definition).

Defendant neither proposed alternative language nor requested the trial court to rewrite this instruction even after the trial court had rejected the instruction for the reason noted above. Under these circumstances, "a trial court need not act as an advocate for either party by crafting instructions embodying a party's theory of the case." *See People v. Garcia,* 28 P.3d 340, 344 (Colo.2001).

No instruction undercut defendant's closing argument that she could not be held accountable for Jaehnig's actions and that she was under arrest when he shot the officer. *Cf. People v. Meller,* 185 Colo. 389, 524 P.2d 1366 (1974). Hence, we conclude defendant's closing argument fairly presented her theory of defense to the jury. *See People v. Dore, supra.*

Accordingly, we find no error, much less plain error.

## D. Sufficiency of the Evidence

Defendant challenges sufficiency of the evidence to sustain her conviction on the felony murder charge. We perceive the evidence as sufficient.

When assessing sufficiency of the evidence, the reviewing court must determine whether any rational trier of fact could accept the evidence, taken as a whole and in the light most favorable to the People, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt. *People v. Sprouse,* 983 P.2d 771 (Colo.1999).

1.

■ Defendant first disputes sufficiency of the evidence that she was "in immediate flight from" the burglary because she and Jaehnig drove away from the Lodge without

incident and the deputies did not begin to pursue them until several minutes later, about ten miles from the Lodge. She further contends Jaehnig then sought to elude the deputies because he was driving a stolen car, possessed illegal weapons, and was under the influence of methamphetamines, not because he feared that a burglary had been detected. We disagree.

As to defendant's first argument, no Colorado case has defined the commencement of flight, either before or after addition of "immediate flight" to the felony murder statute in 1971. *See* Colo. Sess. Laws 1971, ch. 221, § 40–3–102(1)(b) at 418 (now codified with amendments at § 18–3–102(1)(b)).

After that amendment, however, the supreme court explained, "There can be no exact measure of time or distance which is dispositive of whether felony murder exists." *People v. McCrary, supra,* 190 Colo. at 553, 549 P.2d at 1332. There, the defendant's accomplice killed the victim some time after and some distance from the robbery and kidnapping; the police were never in hot pursuit. *Cf. People v. Harlan,* 8 P.3d 448, 486 (Colo.2000)(noting similar wording in death penalty statute, § 18–1.3–1201, C.R.S. 2002 (formerly § 16–11–103(5)(g)), and felony murder statute, and concluding the jury could have found that "the attempted murder [of one victim] and [the other victim's] killing were part of a single continuous transaction" even though "the attempted murder ... and [the] death occurred at different times and places").

■ Given this broad view, and the undeniable fact that felons generally do not remain at crime scenes awaiting arrival of the authorities, we reject defendant's attempt to equate "immediate flight" with "immediate pursuit." Instead, we adopt the approach of other jurisdictions that treat "flight" as departure from the crime scene. *See People v. Gladman, supra* (defendant walked through the neighborhood where the robbery had occurred for several minutes before encountering police). *See generally* 2 Wayne R. Lafave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.5(f)(1), at 225 (1986).

Moreover, the jury could have concluded defendant and Jaehnig were consciously flee-

ing from the moment they left the Lodge based on defendant's contact with the resident who challenged her and then took down the license plate numbers, as well as the evidence that Jaehnig and defendant drove off soon after items taken from boyfriend's room had been loaded into the Trans Am.

■ As to defendant's second contention, the jury also could have concluded Jaehnig sought to evade the deputies because of the burglary and because the bolt cutters used to cut the padlock were in the Trans Am along with items taken from boyfriend's room.

### 2.

■ Defendant again argues her flight had ended because she was in custody at the time Jaehnig killed the officer. Under our interpretation of the felony murder statute, however, we look to the evidence that Jaehnig's flight was ongoing.

Moreover, even if the jury considered only defendant's conduct in deciding the causation issue, in our view the evidence does not compel the conclusion that her arrest ended her immediate flight. Rather, applying the causation principles discussed above, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that she initiated the chain of events which began with a burglary, was not terminated by an independent intervening cause, and ended with the officer's death.

### 3.

■ Defendant argues the officer's death was so unforeseen and unforeseeable that the felony murder conviction cannot stand. Again, we disagree.

The General Assembly has included all types of burglary in the felony murder statute based on the risk of violence inherent in that crime. Detection of a crime by police followed by their giving chase is a recurring facet of criminal episodes. *See Whitman v. People, supra. See generally* Lafave, *supra,* § 3.12(h), at 417.

And we share the Supreme Court's view that "the possibility of bloodshed is inherent in the commission of any violent felony and

this possibility is generally foreseeable and foreseen; it is one principal reason that felons arm themselves." *Tison v. Arizona*, 481 U.S. 137, 151, 107 S.Ct. 1676, 1684, 95 L.Ed.2d 127, 140 (1987).

### E. Felony Murder Instruction

Defendant next asserts the trial court erroneously instructed the jury concerning felony murder. Defendant concedes she did not object to these instructions at trial, but argues we must nevertheless review them for constitutional harmless error rather than for plain error. We find no reversible error.

■ An instruction that omits an essential element of a crime no longer constitutes structural error, but must be addressed as either constitutional harmless error or plain error. *Griego v. People*, 19 P.3d 1 (Colo. 2001). Defendant's failure to object suggests plain error review. *See People v. Dunlap*, 975 P.2d 723 (Colo.1999). *But see People v. Davis*, 794 P.2d 159, 189 (Colo.1990)(when unpreserved error is of constitutional dimension, "reversal is required unless this court is convinced that the error was harmless beyond a reasonable doubt").

■ To rise to the level of plain error, an error must have so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Bogdanov v. People*, 941 P.2d 247 (Colo.1997).

■ Under constitutional harmless error review, reversal is required unless the court is confident beyond a reasonable doubt that the error did not contribute to the verdict obtained, *see Griego v. People, supra*, 19 P.3d at 8, or is "convinced beyond a reasonable doubt that the trial court's error ... was harmless." *People v. Harlan, supra*, 8 P.3d at 490.

■ The two standards of review are "quite similar in practice." *Graham v. People*, 705 P.2d 505, 509 n. 6 (Colo.1985). Under either standard, the appellate court may consider the entire record, including all the jury instructions given. *Gann v. People*, 736 P.2d 37 (Colo.1987)(plain error); *People v.*

*Welsh*, 58 P.3d 1065 (Colo.App.2002)(constitutional harmless error).

Here, we need not decide which standard applies because upon the entire record we conclude reversal would not be required under the higher standard of constitutional harmless error. *See People v. Jurado*, 30 P.3d 769 (Colo.App.2001).

#### 1.

■ Defendant contends the trial court's felony murder instruction failed to require proof of each element of felony murder, including all elements of the predicate felony, burglary. We disagree.

The trial court instructed the jury on felony murder as including the elements that defendant "committed Burglary," and "in the course of or in the furtherance of Burglary, or in the immediate flight therefrom," the death of the officer was caused. Other instructions set out the elements of the two types of burglary at issue. The jurors were further instructed that the People had to prove each of the elements beyond a reasonable doubt.

■ Defendant first argues this instruction should have set forth verbatim the applicable elemental definition of the predicate burglary offense. Nevertheless, the felony murder instruction tracks the language of the statute, and instructions patterned after the pertinent statutory language are generally sufficient. *People v. Brandyberry*, 812 P.2d 674 (Colo.App.1990).

The instruction also follows CJI–Crim. 9:02 (1983). The supreme court continues to cite CJI–Crim. as authoritative. *See, e.g., Patton v. People*, 35 P.3d 124, 131 (Colo.2001)(definition of "possession").

In *People v. Kittrell*, 786 P.2d 467, 469 (Colo.App.1989), a division of this court approved a felony murder instruction that set out among the elements: "(4) committed robbery, and (5) in the course of or in the furtherance of robbery, or in the immediate flight therefrom." The division focused on the instructions as a whole, noting the felony murder instruction followed the statute and both this instruction and the separate robbery instruction conformed with CJI–Crim.

Defendant cites no case supporting her second assertion that the felony murder instruction should have included at least a cross-reference to the instructions defining burglary. CJI–Crim. does not use a cross-reference.

Furthermore, we perceive the alleged error in this instruction as, at worst, comparable to reliance on a separate instruction to define the culpable mental state that did not appear in the elemental instruction. *See Gann v. People, supra.*

Here, the instructions as a whole sufficiently informed the jury that one element of felony murder was defendant had "committed Burglary." And the felony murder statute includes among predicate offenses all types of burglary.

Hence, we conclude the error, if any, is not grounds for reversal.

### 2.

Defendant next argues the felony murder instruction erroneously omits the statutory language "that he or she is committing or attempting to commit." We perceive no error in this aspect of the instruction.

This phrase was not required in *People v. Kittrell, supra.* Nor does it appear in CJI–Crim. 9:02. The burglary of boyfriend's room had occurred at least an hour before the officer's death. The issue argued by both sides to the jury was "immediate flight therefrom." *Cf. People v. Renaud, supra.*

The wording "[b]urglary, or in the immediate flight therefrom ... the death of [the] Officer ... is caused by anyone" sufficiently required that the People prove a causal connection beyond a reasonable doubt.

### 3.

Defendant further contends the statutory affirmative defense instruction, which she admits mirrors the language of § 18–3–102(2), C.R.S.2002, was inadequate "under the unique facts of this case." We disagree.

Because defendant tendered this instruction, any error was invited. *See People v. Zapata,* 779 P.2d 1307 (Colo.1989). Defendant seeks to avoid this doctrine by arguing

"failure of the court fully to instruct on the law." However, defendant did not tender any supplemental instruction specific to this affirmative defense. Moreover, an instruction that tracks the statutory language is generally proper. *See, e.g., People v. Brandyberry, supra.*

### III. Other Instructional Errors

Defendant next alleges for the first time on appeal various instructional errors concerning other charges. We are not persuaded.

### A. Burglary

Defendant asserts the first degree burglary and second degree burglary instructions were defective for failure to set out verbatim, or by cross-reference to other instructions, the elements of the ulterior felonies. We disagree.

Because defendant tendered the second degree burglary instruction, the invited error doctrine precludes her challenge. *See People v. Zapata, supra.*

Furthermore, defendant cites no supporting Colorado authority. Nor does CJI–Crim. reflect her view. For the reasons discussed above concerning the structure of the felony murder instruction, we perceive no error, either plain or constitutional.

### B. Unlawful Entry

Defendant next argues the instruction defining second degree burglary was defective because it lacks the element of "unlawful entry." We find no error.

As previously indicated, because defendant tendered this instruction, we are limited by the doctrine of invited error. *See People v. Zapata, supra.*

Moreover, the applicable version of the second degree burglary statute sets out three alternative means of committing the offense: "A person commits second degree burglary, if he knowingly breaks an entrance into, or enters, or remains unlawfully in a building or occupied structure with intent to commit therein a crime against a person or property." Colo. Sess. Laws 1971, ch. 121,

§ 40–4–203 at 427 (now codified with amendments as § 18–4–203(1), C.R.S.2002). Use of the disjunctive "or" marks different categories. *Carlson v. Ferris*, 58 P.3d 1055 (Colo.App.2002).

A jury need not be instructed on alternative means of committing an offense. *People v. Hansen*, 972 P.2d 283 (Colo.App. 1998). And CJI–Crim. 14:03 contemplates separate use of the "breaks an entrance into" means of committing the offense, as the jury was instructed here.

Nevertheless, defendant argues, and another division of this court has stated, that "case law in this jurisdiction makes 'unlawful entry' an element of the crime of second degree burglary." *People v. Esquibel*, 794 P.2d 1065, 1066 (Colo.App.1990). If the jury should have been instructed on unlawful entry, then no other instruction cured this defect.

However, here, as in *Esquibel*, defendant could not claim a right to enter the burgled premises. Boyfriend testified that he padlocked his door to keep people from "wandering in and out with [his] things," he did not provide defendant a key to the padlock, and he had not given defendant permission to enter his room after installing the padlock. Moreover, in closing argument defendant conceded that she "should not have been in there."

Therefore, regardless of the invited error limitation, we conclude beyond a reasonable doubt that the absence of a reference to "unlawful entry" could not have contributed to the conviction on this count.

## C. Theft

Defendant challenges the instruction on theft, which was the ulterior felony set forth in the second degree burglary instruction. She argues, as held in *People v. Bornman*, 953 P.2d 952, 954 (Colo.App.1997), that this instruction did "not explicitly require a finding that the defendant knew that his possession or control of the item was without the authorization of the owner" because the "without authorization" element did not include the term "knowingly."

This instruction misdescribed an element, and other instructions did not cure the defect. However, considering the entire record, including the evidence and counsels' arguments, we perceive no basis for reversal. *See People v. Harlan, supra* (court looked to evidence and concluded that constitutional error in instruction played no role in the death sentence imposed).

The defendant in *Bornman* claimed lack of knowledge that a car supposedly given to him by a friend had been stolen. Here, in contrast, defendant admitted to the police she knew boyfriend's property was being taken from his room by persons whom she had led to that room.

Nevertheless, defendant contends omission of "knowingly" prejudiced her on the second degree burglary conviction because, even if she "broke an entrance into" boyfriend's room, the jury could still have concluded that at the moment of breaking the entrance, she intended to remove only her own property. We disagree.

In *Cooper v. People*, 973 P.2d 1234 (Colo. 1999), the court noted that intent must be examined at the moment of unlawful entry. However, defendant's argument ignores her reference to retaliation and description of boyfriend's property the night before, plus the agreement to go to the Lodge when the residents were likely to be out.

In a burglary case, the requisite specific intent can and often must be inferred from a defendant's conduct and surrounding circumstances. *People v. Germany*, 643 P.2d 776 (Colo.App.1980). Given defendant's admissions, in our view the failure to instruct on "knowingly" could not have affected that inferential process.

We need not address defendant's further reliance on *Bornman* to justify taking back items she had purchased for boyfriend when their relationship had ended. Her argument does not explain taking the speakers and other pieces of boyfriend's stereo equipment. The People argued in closing, "there's plenty of other items that she didn't buy for him that were taken." Defendant never disputed either boyfriend's ownership of these items

or their value, and she acknowledged in closing that "things were taken."

Thus, we are confident beyond a reasonable doubt "there was virtually no chance that this misinterpretation [of knowingly] could have played any role in the verdict." *See People v. Price,* 969 P.2d 766, 769 (Colo. App.1998).

### D. Conspiracy

■■■ We reject defendant's contention that her convictions for second degree burglary and conspiracy to commit first degree burglary must be vacated because the instructions defining these offenses did not set forth verbatim all elements of the underlying crimes. We have already rejected a similar contention concerning the structure of the felony murder and burglary instructions. Defendant presents no new arguments here.

### E. Implied Threats

■■■ Defendant argues her conviction for menacing must be vacated because the trial court erred in instructing the jury on the defense of duress. The trial court gave an instruction that tracked § 18–1–708, C.R.S. 2002, and CJI–Crim. 7:09. Nevertheless, defendant asserts the trial court erred when it refused her tendered instruction that "threatened use" of force "includes implied threats" against her by Jaehnig. We disagree.

Neither § 18–1–708 nor CJI Crim. addresses "implied threats." The supreme court has viewed narrowly the kinds of threats that may provide the basis for a duress defense. *See Bailey v. People,* 630 P.2d 1062, 1068–69 (Colo.1981)("mere speculation that injury may occur is not sufficient"); *see also People v. Trujillo,* 41 Colo. App. 223, 226, 586 P.2d 235, 237 (1978)(threat must be "definite, specific, and imminent").

Here, defendant's evidence of an implied threat when she took the wheel as Jaehnig shot at the pursuing deputies falls short of this standard. Moreover, the duress instruction given did not foreclose the jury from considering an implied threat, and in closing defendant argued duress based on her fear of Jaehnig.

### F. Choice of Evils

■■ Defendant further contends her conviction for menacing must be vacated because the trial court erred when it refused to instruct the jury on the affirmative defense of choice of evils. We do not agree.

■■■ Section 18–1–702, C.R.S.2002, recognizes the affirmative defense of choice of evils. Before submitting this defense to the jury, the trial court must determine "as a matter of law whether the claimed facts and circumstances would, if established, constitute a justification." Section 18–1–702(2), C.R.S.2002. Here, the trial court properly recognized that it must look at the evidence in the light most favorable to defendant. *See People v. Brandyberry, supra.*

Under § 18–1–702(1), C.R.S.2002, the defense must be based on "a situation occasioned or developed through no conduct of the actor." Here, the trial court correctly ruled that defendant's conduct before, during, and after the burglary "occasioned and developed this particular situation." *Cf. People v. Calvaresi, supra,* 188 Colo. at 283, 534 P.2d at 319 (similar limitations on independent intervening cause).

### IV. Motion to Suppress

Defendant contends the trial court erred in denying her motion to suppress her statements to police immediately after arrest and her two videotaped statements. We are not persuaded.

A trial court's findings of fact in connection with a motion to suppress are entitled to deference by a reviewing court and will not be overturned if supported by competent evidence. However, its ultimate legal conclusions are subject to de novo review. *People v. Heilman,* 52 P.3d 224 (Colo.2002).

Following an evidentiary hearing, the trial court made oral findings that the limited questioning of defendant upon arrest was proper, despite lack of an advisement under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because of the need to protect both police officers and the public. *See New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

The trial court also found, albeit without amplification, that these statements had been voluntary. After adjourning the hearing to watch the two videotapes, the trial court entered a written order finding defendant had been given proper *Miranda* advisements at police headquarters and her statements there were voluntary.

As to defendant's statements when arrested, crime scene circumstances that justify limited questioning to protect the safety of police and the public will often be very intense. The police are dealing with an exigent, evolving situation; the defendant has just been taken into custody. *See, e.g., People v. Ingram,* 984 P.2d 597 (Colo.1999).

▮ Here, although the police used some harsh words toward defendant, who was handcuffed, they asked only about Jaehnig's location and how he was armed. Defendant responded to some questions, but not to others, and made comments to police at times when she had not been asked a question. We conclude the evidence of the circumstances at the crime scene supports the trial court's conclusion of voluntariness.

▮ As for the two videotaped statements, the tapes themselves show that defendant spoke by her own choosing. *See People v. Al Yousif,* 49 P.3d 1165, 1171 (Colo. 2002)("the video's existence enables us to undertake this review not just from the 'cold record' "). Initially, she wanted to explain her position. Later, she sought to correct her earlier false statements. Again, the record supports the trial court's written finding of voluntariness.

Therefore, the trial court properly denied the motion to suppress.

## V. Sufficiency of Evidence of Burglary

▮ Defendant contends the evidence was insufficient to sustain her conviction for second degree burglary. Defendant argues that because undisputed evidence showed she had often spent time in boyfriend's room and she kept some of her belongings there, she was lawfully in his room on the day of the offense. Viewing the evidence in the light most favorable to the People, *see People v. Sprouse, supra,* we are not persuaded.

▮ If previously granted authority to enter is withdrawn, then the person who had authority to enter may be convicted of burglary. *People v. Waddell,* 24 P.3d 3 (Colo. App.2000).

For reasons discussed above concerning "unlawful entry" in connection with the second degree burglary instruction, the jury reasonably could have concluded that defendant was unlawfully in boyfriend's room.

The jury also could have found defendant guilty as a complicitor because she admitted to police that she remained in boyfriend's room while items which she knew belonged to him were taken by her companions. *See Medina v. People,* 168 Colo. 255, 450 P.2d 662 (1969).

## VI. Evidentiary Rulings

Defendant asserts her constitutional right to confront adverse witnesses was violated when the trial court admitted a police report of an interview with girlfriend, limited her cross-examination of girlfriend, and admitted a videotaped statement of D.G. We agree only that the police report should not have been admitted, but find no reversible error.

Under both the state and federal constitutions, a criminal defendant has a right to confront adverse witnesses. U.S. Const. amend. VI; Colo. Const. art. II, § 16; *Merritt v. People,* 842 P.2d 162 (Colo.1992).

The prior out-of-court statement of a witness is hearsay. CRE 801. Where hearsay evidence has been erroneously admitted over objection, we must consider whether the error was harmless beyond a reasonable doubt. *Blecha v. People,* 962 P.2d 931 (Colo.1998).

Trial courts enjoy broad discretion in ruling on the admissibility of evidence. *People v. Eggert,* 923 P.2d 230 (Colo.App.1995). We reverse only upon an abuse of discretion. *People v. Garcia,* 17 P.3d 820 (Colo.App. 2000).

### A. Police Report

▮ The trial court admitted a one-page police report of a detective's interview with girlfriend over defendant's objection that "it

hasn't been authenticated." No witness authenticated the report. Thus, we conclude that the trial court erred in admitting the report.

■ The People argue this issue must be examined under the plain error standard because defendant did not adequately object to admission of the report. We do not agree. Defendant's objection included specific reference to lack of an authenticating witness, which we find sufficient to raise the hearsay issue. *See Blecha v. People, supra.*

■ The People also assert the report was not hearsay under CRE 801(d)(1)(A), which concerns the prior inconsistent statement of a declarant who testifies at trial and is subject to cross-examination. Because the report was not first authenticated as a statement of girlfriend, we disagree that CRE 801(d)(1)(A) applies. *Cf. Leiting v. Mutha,* 58 P.3d 1049 (Colo.App.2002)(hearsay statements in a public report must be separately authenticated).

■ Alternatively, the People contend even if the report was hearsay, testimony of girlfriend concerning her interview by the detective constituted sufficient authentication. We disagree. Girlfriend testified that the report was not entirely accurate concerning her statements to the detective.

However, "errors in the admission of evidence, even of constitutional dimension, do not require reversal of a criminal conviction if the errors are harmless beyond a reasonable doubt." *People v. Welsh, supra,* 58 P.3d at 1072.

Factors in that determination include "the importance of the declarant's statement to the prosecution's case, whether the statement was cumulative, the presence or absence of corroborating or contradictory evidence on the material points of the witness's testimony, the extent of the cross-examination otherwise permitted, and the overall strength of the prosecution's case." *People v. Harris,* 43 P.3d 221, 230 (Colo.2002).

■ Defendant argues admission of the report could not have been harmless beyond a reasonable doubt, emphasizing its references to: the car containing girlfriend took a side road to evade police; defendant knew that some of the items taken belonged to boyfriend; the three men accompanied defendant to scare boyfriend; and girlfriend requested an attorney. Applying the *Harris* factors, we are not persuaded.

The People mentioned the report only once, very briefly, during opening statement and not at all during closing argument or rebuttal. That single reference was to girlfriend's use of the fictitious names "John" and "Dan" to describe D.G. and Jaehnig's friend, which she admitted from the witness stand.

The isolated statement in the report that girlfriend's car avoided a sheriff's vehicle was controverted by testimony of both girlfriend and D.G. The references to defendant's knowledge of boyfriend's property being taken were cumulative of defendant's own statements to the police, as was her recognition of possible violence involving the three men and boyfriend. The indication that girlfriend requested an attorney must be viewed in the overall context, including defendant's cross-examination of girlfriend concerning both the multiple charges against her and her guilty plea. *CF. People v. Ashton,* 661 P.2d 291 (Colo.App. 1982)(reference to defendant's silence briefly elicited, pursued no further and not commented on in summation).

We conclude beyond a reasonable doubt that the "record fails to establish a reasonable probability that [defendant] could have been prejudiced by the erroneous admission of [girlfriend's] hearsay statements." *See People v. Harris, supra,* 43 P.3d at 230.

■ Defendant further argues the trial court compounded its error by allowing the jury access to the police report during deliberations, citing *People v. Montoya,* 773 P.2d 623 (Colo.App.1989). This argument does not change our conclusion.

Defendant did not separately object under the *Montoya* rationale, which limits us to plain error review. Moreover, *Montoya* deals with a videotape and discusses depositions, both of which contain extensive verbatim statements, as opposed to a brief paraphrase of a declarant's statements such as the police report here. In any event, our

constitutional harmless error analysis of the contents of the report would be the same under *Montoya*.

### B. Limitation on Cross Examination

■ Defendant also argues she should have been allowed in her cross-examination of girlfriend to elicit testimony that girlfriend pleaded guilty on the advice of counsel. We discern no abuse of discretion.

A witness may be impeached if he or she has been convicted of a felony. Section 13–90–101, C.R.S.2002; *People v. Gallegos*, 950 P.2d 629 (Colo.App.1997). Where the witness is a codefendant, the guilty plea is admissible to show acknowledgment by the accomplice of participation in the offense. *People v. Brunner*, 797 P.2d 788, 789 (Colo. App.1990). The trial court has discretion to limit inquiry into facts underlying the accomplice's conviction. *People v. Renstrom*, 657 P.2d 461 (Colo.App.1982).

Here, in lengthy cross-examination, defendant established that girlfriend pleaded guilty to a lesser felony among the multiple offenses charged. Additional testimony that girlfriend had pleaded guilty on the advice of counsel would undermine the rationale of *People v. Brunner*, *supra*, and would have told the jury only what it could readily have inferred.

### C. D.G.'s Statement

Defendant argues the trial court erred in admitting D.G.'s forty-two-minute videotaped statement to police. We do not agree.

The prior inconsistent statement of a witness may be used both to impeach the witness and as substantive evidence. Section 16–10–201, C.R.S.2002; CRE 613; *Montoya v. People*, 740 P.2d 992 (Colo.1987). The prior consistent statement of a witness may also be used to rebut an inference of recent fabrication. CRE 801(d)(1)(B).

■ During the People's direct examination of D.G., he claimed inability to recall what he had told the police. In her cross-examination, defendant developed that D.G. had pleaded guilty to one of seven charged felonies.

The People then offered D.G.'s videotaped statement as a prior inconsistent statement. Defendant made a foundation objection to showing the entire statement, claiming that the People had established only two or three specific contradictions. The trial court admitted the entire videotape as both a prior inconsistent statement and "in certain instances" as a prior consistent statement.

Thus, the trial court did not abuse its discretion in admitting the entire statement.

Use of a prior inconsistent statement does not require an absolute contradiction. *See United States v. Gravely*, 840 F.2d 1156 (4th Cir.1988). Even a difference in some details between court testimony and a prior statement justifies admission of the prior statement. *People v. Fisher, supra.* Moreover, defendant's cross-examination as to the guilty plea permitted an inference of recent fabrication. We view the statements of police officers on the videotape as only providing context for D.G.'s responses. *Cf. People v. Arnold*, 826 P.2d 365 (Colo.App. 1991).

■ Although defendant now also argues the prejudicial content of the profanity-filled statement, at trial she made no separate objection on this basis. Hence, we review the issue for plain error. *See* Crim. P. 52(b); *People v. Fisher, supra.*

■ In our view, the jury's taking use of profanity and admission of minor bad acts by D.G. as evidence of defendant's guilt is highly unlikely, in light of his nascent relationship to defendant. We perceive no prejudice to defendant from D.G.'s stated reluctance to discuss certain subjects without an attorney, given defendant's eliciting on cross-examination that D.G. had pleaded guilty to one of several charged felonies. Further, much of the videotape, such as the discussion of Jaehnig's interest in weapons, was cumulative.

Accordingly, we discern no plain error.

### VII. Playback of Defendant's Videotape Statement

Defendant contends the trial court erred when, outside her presence and that of her counsel, it responded to a jury question about replaying her videotaped statement, alone

oversaw the jury's review of the videotape, and also required the jury to review the entire videotape from beginning to end, rather than in segments. We agree only that the trial court should have involved counsel and defendant before responding, but find no reversible error.

A defendant has a right to counsel and to be present at all "critical stages" of a criminal proceeding. A violation of this right is constitutional error, mandating reversal unless the appellate court concludes that the error was harmless beyond a reasonable doubt. *See Key v. People*, 865 P.2d 822 (Colo.1994); *Leonardo v. People*, 728 P.2d 1252 (Colo.1986).

A critical stage exists when more than a minimal risk arises that, in the absence of the defendant's counsel, the defendant's right to a fair trial may be adversely impacted. *Key v. People, supra*. However, a defendant's presence is not required when it would be useless or the benefit nebulous. *See Luu v. People*, 841 P.2d 271 (Colo.1992).

After the jury had begun deliberating, it sent the trial court a note asking, "[Are] the transcripts of [defendant's] statements available to us? If so, can we please have them? If not, could we please view the *second* statement [?]"

Without contacting counsel, and with only the court reporter present, the trial court brought the jury into the courtroom. In answer to one juror's oral question, the trial court said that the videotape could not be stopped or rewound, but that it must be played continuously from beginning to end. The trial court told the jurors not to discuss the case while they watched the videotape. The trial court then sat with the jury to watch the videotape. The jury did not ask to see the tape again, but retired and resumed its deliberations.

### A.   Ex Parte Communication

■ We conclude the jury's written request to view the videotape constituted a critical stage and the trial court erred by failing to involve counsel and defendant before responding.

Although not yet resolved by either the Colorado Supreme Court or the United States Supreme Court, a division of this court has held that a defendant has a constitutional right to be present whenever the trial court communicates with the jury. *People v. Grace*, 55 P.3d 165 (Colo.App.2001). Moreover, a criminal defendant's constitutional right to counsel applies when the judge gives instructions to the jury or responds to questions from the jury on legal issues or facts of the case. *Leonardo v. People, supra; People v. Trujillo*, 62 P.3d 1034 (Colo.App. 2002).

Nevertheless, the court in *Leonardo* rejected the view that ex parte communications between court and jury always require reversal, explaining, "If the judge properly responds to an inquiry from the jury, there is no prejudice to the defendant. Also, if the matter is one that has no reasonable possibility of affecting the verdict, the error would be harmless beyond a reasonable doubt." *Leonardo v. People, supra*, 728 P.2d at 1257–58 n. 6.

■ Here, unlike *Leonardo*, the trial court's response did not raise substantive legal questions. And, unlike *Key*, here the trial court's comments to the jury were properly solicitous of the deliberative process. Further distinguishing this case from *Key*, nothing that occurred concerning the videotape would have been the subject of counsel's making a record beyond that which the trial court carefully made and is before us.

The content of the videotape, defendant's own statements to police that had been admitted as direct rather than merely impeaching evidence, did not warrant any limiting instruction. *See State v. Ritchie*, 46 Wis.2d 47, 174 N.W.2d 504 (1970); *cf. People v. Balkey*, 53 P.3d 788 (Colo.App.2002).

Most important, in closing argument both sides had urged the jury to watch the videotape again, and defendant had concurred in the trial court's earlier decision not to allow the jury access to transcripts of the videotapes.

In our view, the trial court properly allowed the jury to watch the videotape. Hence, we conclude beyond a reasonable

doubt there was no possibility that the failure to involve defendant and her counsel in responding to the jury's question affected the verdict. *See People v. Grace, supra.*

### B. Playback of the Videotape

■ Next, we examine the absence of defendant and counsel while the jury actually viewed the videotape. We find no error.

In *People v. Valdez,* 725 P.2d 29 (Colo.App. 1986), a division of this court held that replaying for the jury an audiotape involving a defense witness did not constitute a critical stage of the proceedings. Counsel for both sides were present, but the defendant was not present.

The majority view supports *People v. Valdez, supra,* where counsel either was present or had asked to be excused. *See Valdez v. Gunter,* 988 F.2d 91 (10th Cir.1993)(habeas review of same case); *United States v. Sobamowo,* 892 F.2d 90 (D.C.Cir.1989); *People v. Ayala,* 23 Cal.4th 225, 96 Cal.Rptr.2d 682, 1 P.3d 3 (2000); *State v. Ritchie, supra.* But see *People v. Lumpkin,* 173 A.D.2d 738, 570 N.Y.S.2d 620 (1991)(rereading of testimony is critical stage).

Hence, we first conclude that defendant's presence was not required. On the particular facts of this case, we further conclude that the presence of counsel was not required.

■ Here, the jury's review of the videotape was not potentially tainted by any other circumstance. *Cf. United States v. Kupau,* 781 F.2d 740 (9th Cir.1986)(jury's review of taped conversations was critical stage where FBI agent, who sat at government table during trial, acted as tape technician, no record was made, and no one else was present). Nor was the review vulnerable to manipulation or confusion, given both the nature of a videotape and the trial court's replay procedure. Had counsel been present, they would not have been allowed to speak, and in our view that passive role could not have affected defendant's substantive rights. *See People v. Valdez, supra.* Finally, the trial court made a complete record.

Therefore, we conclude that bringing the jurors back into the courtroom to review the videotape did not separately constitute a critical stage of the proceeding.

### C. Restricted Access to the Videotape

■ Next, we address the trial court's requirement that the jury watch the videotape continuously from beginning to end, rather than allowing the jury unrestricted access to the videotape and playback equipment, as defendant now contends would have been proper. We perceive no error.

The trial court has discretion in deciding whether to read back testimony to a jury during its deliberations. *People v. Balkey, supra; People v. Coit,* 961 P.2d 524, 531 (Colo.App.1997). In determining how a witness's videotaped statement should be made available to the jury during deliberations, a division of this court has recognized that "[t]he precise procedure to be followed ... lies within the trial court's sound discretion." *People v. Montoya, supra,* 773 P.2d at 626.

In general, to avoid undue emphasis on physical evidence of a testimonial character, a jury should not be given unrestricted access to a videotape, deposition, or transcript. *See People v. Montoya, supra.* However, where a defendant's statement has been admitted into evidence, the statement *"may* be taken into the jury room during deliberations," *People v. Ferrero,* 874 P.2d 468, 473 (Colo.App.1993)(emphasis supplied), because a defendant's statement is considered to be the strongest evidence the People could produce. *People v. Miller,* 829 P.2d 443 (Colo. App.1991). These cases do not require that the jury must be given unrestricted access to a defendant's statement.

Further, defendant's argument on appeal that upon the jury's request it should have been given unrestricted access to the videotape is not consistent with her position at trial. Despite defense counsel's closing argument, "you can go back or the judge will allow you to review [the videotapes]," the record does not show defendant requested that the jury be provided with playback equipment at the start of its deliberations.

### VIII.   Polling the Jury

Defendant argues the trial court's "imprecise hurry-up" polling of the jury did not adequately protect her right to a unanimous verdict.  We are not persuaded.

Under the federal constitution and state statute, a defendant in a criminal case has a right to a unanimous verdict.  U.S. Const. amend. VI; § 16-10-108, C.R.S. 2002; *People v. Hall*, 60 P.3d 728 (Colo.App.2002).  Crim. P. 31(d) implements this right by allowing a defendant to have the jury polled.

However, a trial court enjoys discretion and need not use particular words in polling a jury.  *United States v. Jefferson*, 258 F.3d 405 (5th Cir.2001); *United States v. Gomez-Lepe*, 207 F.3d 623 (9th Cir.2000).  "[J]urors [need only] be placed in a situation (i.e., polling in open court) that allows them to be free of jury-room coercion."  *United States v. Williams*, 990 F.2d 507, 512 (9th Cir.1993)(interpreting substantially similar Fed.R.Crim.P. 31(d)); *see Duran v. Lamm*, 701 P.2d 609 (Colo.App.1984)(viewing as authoritative federal court decisions interpreting similar rules).

Here, the trial court informed the jury, "Ladies and gentlemen, I'm now going to ask you quickly whether I read these charges correctly."  The trial court then asked each juror, "This is your verdict?"  Each juror responded affirmatively.

Defendant did not object to this procedure, and so our review is limited to plain error.  *See* Crim. P. 52(b); *Wilson v. People, supra.*

The record reflects neither confusion nor reservation when the trial court polled the jury.  In light of the discretion afforded the trial court, we perceive no error, much less plain error.

** Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

### IX.   Cumulative Error

Finally, defendant argues the alleged errors, "when reviewed for their cumulative impact," require reversal.  We disagree.

The cumulative effect of errors may preclude a defendant from receiving a fair trial.  *People v. Botham*, 629 P.2d 589 (Colo.1981).  This doctrine, however, applies in cases plagued by "[n]umerous formal irregularities."  *People v. Reynolds*, 194 Colo. 543, 545, 575 P.2d 1286, 1289 (1978); *see also People v. Rivers*, 727 P.2d 394 (Colo.App.1986).  If the errors were harmless, their cumulative effect will not warrant a new trial.  *See People v. Dore, supra.*

Here, defendant has not shown that numerous errors occurred.  We have held that each of the trial court's three errors—the wording of the theft instruction, admission of the police report, and ex parte response to the jury's question—was harmless beyond a reasonable doubt.

Defendant was entitled to a fair trial, not a perfect trial.  *See People v. Roy*, 723 P.2d 1345 (Colo.1986).  We conclude that the cumulative error doctrine does not require a new trial in this case.

The judgment is affirmed.

Judge PLANK ** concurs.

Judge JONES dissents without opinion.

§ 24-51-1105, C.R.S.2002.