22CA0873 Peo v Ewing 05-22-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0873
Jefferson County District Court No. 18CR3105
Honorable Tamara S. Russell, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee and Cross-Appellant,

v.

Alex Christopher Ewing,

Defendant-Appellant and Cross-Appellee.

---

JUDGMENT AND ORDER AFFIRMED AND RULING DISAPPROVED

Division I
Opinion by JUDGE BROWN
J. Jones and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado; Alexis King, District Attorney, Rebecca A. Adams, Senior Deputy District Attorney, Golden, Colorado, for Plaintiff-Appellee and Cross-Appellant

Suzan Trinh Almony, Alternate Defense Counsel, Broomfield, Colorado, for Defendant-Appellant and Cross-Appellee

¶ 1     Defendant, Alex Christopher Ewing, appeals his judgment of conviction entered on a jury verdict finding him guilty of three counts of first degree murder and one crime of violence sentence enhancer, contending that the district court erred by admitting certain evidence.  On cross-appeal, the People contend that the court erred by dismissing one count of first degree felony murder and in granting Ewing presentence confinement credit (PSCC).  We affirm Ewing's judgment of conviction, disapprove of the court's dismissal of the felony murder charge, and affirm the court's award of PSCC.

## I.     Background

¶ 2     On January 10, 1984, the victim was found dead in her Lakewood home by her daughter.  She was nude from the chest down, her bra had been pushed up, her legs had been spread, her underwear had been removed and left near her body, and her face had been partially covered by a Winnie the Pooh blanket.  Investigators determined that the victim had been sexually assaulted and struck in the head sixteen times with both the broad face and claw part of a hammer.  The perpetrator left the hammer next to the victim's head under the blanket.

1

¶ 3     The victim's house was next to an open space and had a detached garage. The garage had been left open, and the front door was unlocked. There were no signs of forced entry. The victim's gold coin necklace and diamond rings were missing, the contents of her purse were strewn about her bedroom, and money was missing from her wallet.

¶ 4     Investigators photographed the crime scene, collected the blanket, and cut out portions of the carpet from underneath and around the victim. Investigators also collected a sample of a white substance near the victim's vaginal area and a sample of a crusty white substance near the victim's anal area. In 2018, analysts from the Colorado Bureau of Investigation (CBI) determined that the blanket, the carpet, and the samples taken from the victim's body contained DNA that matched Ewing's DNA profile.[1]

¶ 5     In August 2018, the People charged Ewing with first degree murder after deliberation, § 18-3-102(1)(a), C.R.S. 1984; first degree

---

[1] Ewing was incarcerated for other crimes he committed in Nevada later in 1984. In 2018, his DNA was collected and uploaded into a national database. Within a week, CBI analysts matched the DNA profiles developed from the samples taken from the victim, blanket, and carpet with Ewing's DNA profile.

felony murder predicated on robbery, § 18-3-102(1)(b), C.R.S. 1984;[2] first degree felony murder predicated on sexual assault, *id.*; and a crime of violence sentence enhancer.[3]  The jury found Ewing guilty as charged.

¶ 6 The district court sentenced Ewing to a controlling term of life in the custody of the Department of Corrections.  It merged the two felony murder convictions into the murder after deliberation conviction and ordered Ewing's sentence to run consecutively to his sentences for convictions in two other cases.  The court later awarded Ewing PSCC.

## II.    Ewing's Evidentiary Claims

¶ 7 Ewing contends that the district court erred by admitting (1) other act evidence under CRE 404(b) and (2) exhibits that he argues were not properly authenticated.  We reject these contentions.

---

[2] Felony murder is now classified as second degree murder.  *See* § 18-3-103(1)(b), C.R.S. 2024.

[3] The prosecution also charged Ewing with first degree felony murder predicated on burglary under section 18-3-102(1)(b), C.R.S. 1984, which the district court dismissed during trial, *see infra* Part III.A.2, and a second crime of violence sentence enhancer, which was withdrawn.

## A. Standard of Review

¶ 8 We review a trial court's evidentiary rulings for an abuse of discretion. *Zapata v. People*, 2018 CO 82, ¶ 25. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *People v. Liggett*, 2021 COA 51, ¶ 16, *aff'd*, 2023 CO 22.

## B. Other Act Evidence

¶ 9 Ewing contends that the district court erred by admitting CRE 404(b) evidence that he sexually assaulted a child and murdered her and her parents. We perceive no abuse of discretion.

### 1. Applicable Law

¶ 10 "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). However, such evidence may be admitted for non-propensity purposes, such as proving identity or showing a common plan, scheme, design, or modus operandi. *See* CRE 404(b)(2); § 16-10-301(3), C.R.S. 2024; *Yusem v. People*, 210 P.3d 458, 463 (Colo. 2009). In the prosecution of sexual offenses, the General Assembly has recognized "a greater need and propriety for

4

consideration by the fact finder of evidence of other relevant acts of the accused, including any actions, crimes, wrongs, or transactions, whether isolated acts or ongoing actions and whether occurring prior to or after the charged offense." § 16-10-301(1), (2).

¶ 11    Even so, the admissibility of other act evidence must be analyzed under the four-part test set forth in *People v. Spoto*, 795 P.2d 1314 (Colo. 1990). Such evidence is admissible if (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the prohibited intermediate inference that the defendant was acting in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Id.* at 1318; *see* CRE 403. The legislature has made clear that evidence of other sexual acts "is typically relevant and highly probative, and it is expected that normally the probative value of such evidence will outweigh any danger of unfair prejudice, even when incidents are remote from one another in time." § 16-10-301(1).

## 2. Additional Background

¶ 12 Before trial, the prosecution provided written notice under CRE 404(b) of its intent to introduce evidence of crimes Ewing committed against a family in Aurora on January 16, 1984.[4] That day, a woman discovered her son dead in his home and called 911. Investigators determined that the man had been struck about ten times with a hammer and his throat had been cut. Paramedics found the man's wife dead in their bedroom. The wife had injuries consistent with stabbing and had been struck on the head with a hammer.

¶ 13 A paramedic also found the couple's eight-year-old daughter dead in her room.[5] She had been sexually assaulted and struck on the head with a hammer several times. The child's pajama bottoms had been cut off and her underwear removed, she was nude from the waist down, and her legs had been spread apart. She had also

---

[4] The prosecution also sought to introduce evidence that Ewing committed a home invasion in Nevada, during which he bludgeoned the two homeowners with an axe handle. The district court denied this request.

[5] The child's younger sister was the sole survivor, but the prosecution did not seek to present any evidence of the injuries to that child.

been covered by a comforter. DNA samples from the blanket and carpet underneath the child victim matched Ewing's DNA profile.

¶ 14    The Aurora family's house was next to an open space, the garage had been left open, and the door that connected the garage to the home was unlocked. There were no signs of forced entry. Only small valuables were stolen, and the contents of the wife's purse were scattered outside the garage.

¶ 15    The prosecution sought to admit evidence of the Aurora crimes to establish Ewing's identity, modus operandi, and common plan, scheme, or design in the murder and sexual assault of the victim in this case.[6] Ewing objected, arguing that the crimes lacked "a compelling pattern" or "remarkable similarity." In a separate pretrial motion, Ewing also offered to stipulate to the manner and cause of both sex assault victims' deaths.

¶ 16    The district court granted the prosecution's motion in a detailed written order. The court determined that the crimes were similar in the following ways:

---

[6] Ewing was tried and convicted of three counts of first degree murder for the Aurora crimes, and his conviction was affirmed on appeal. *See People v. Ewing*, (Colo. App. No. 21CA1541, Apr. 10, 2025) (not published pursuant to C.A.R. 35(e)).

- Both crimes occurred in Colorado within 6 days of each other.

- The assailant entered the homes through an open garage door.

- The victims were murdered in their own homes[.]

- The victims in both cases were beaten severely with injuries focused mostly to the head.

- The assailant used a hammer to kill the victims.

- [The victim's] purse and [the Aurora wife's] purse had the contents dumped on the floor.

- [The victim] and [the child victim] were both sexually assaulted.

- Both sexual assault victims were naked from the waist down with clothing pulled up and covering the top of their [bodies].

- Both sexual assault victims were left with their legs spread apart, covered with a blanket[,] and were found with a pair of underwear near their foot.

- Semen was collected from both sexual assault victims which yielded a DNA profile that was the same[.]

¶ 17    Based on these similarities, the court concluded that the crimes were "connected in point of time and are so similar that they

can be identified as a common plan."  The court also concluded that the distinctive characteristics — "such as bludgeoning the head with a hammer, sexual assault with [the] bottom half of the victim naked and the upper portion covered with clothing, and covering the victim with a blanket" — established a modus operandi.  Thus, the court found that the Aurora evidence was relevant to the material fact of identity independent of the inference that Ewing acted in conformity with his bad character.

¶ 18    The court also conducted a CRE 403 balancing test.  Although the court recognized the egregious nature of the Aurora evidence, it noted that the only evidence linking Ewing to the charged crime was thirty-six-year-old DNA that "will undoubtedly be contested at trial" and that the probative value of the Aurora evidence was strong enough to outweigh its potential prejudicial effect.

### 3.    The District Court Did Not Err by Admitting Evidence of the Aurora Sexual Assault and Murders

#### a.    The Evidence Relates to a Material Fact

¶ 19    Ewing does not contest the district court's conclusion that the first *Spoto* prong was satisfied because the Aurora evidence related

9

to the material fact of whether Ewing was the assailant in the underlying case.

### b. The Evidence Was Logically Relevant Independent of a Bad Character Inference

¶ 20   The second *Spoto* prong requires the party seeking to admit the evidence to show its logical relevance.  *Spoto,* 795 P.2d at 1318. Evidence is logically relevant if it has any tendency to make the existence of a material fact more or less probable than without the evidence.  *Yusem*, 210 P.3d at 464; CRE 401.

¶ 21   Relatedly, the third *Spoto* prong requires that the "logically relevant evidence achieve its relevance in some way other than through the impermissible inference that a person who engages in a bad act does so because he acts in conformity with his bad character." *People v. Jones*, 2013 CO 59, ¶ 16.  "While this third prong does not demand the absence of the impermissible character inference, it 'requires that the proffered evidence be logically relevant *independent* of that inference.'"  *Id.* (quoting *People v. Snyder*, 874 P.2d 1076, 1080 (Colo. 1994)); *see Spoto*, 795 P.2d at 1318; CRE 404(b).

¶ 22　　Ewing contends that evidence of the Aurora sexual assault and murders did not demonstrate either modus operandi or a common plan, scheme, and design because the crimes were too dissimilar and disconnected.  Consequently, he argues, the logical relevance of the Aurora evidence to his identification as the perpetrator in the underlying case depended entirely on the impermissible inference that he has a bad character.  We perceive no abuse of discretion in the district court's decision to admit the Aurora evidence as modus operandi evidence.[7]  And because the evidence was admissible as modus operandi, its relevance was independent of the impermissible character inference.  *See People v. Delgado*, 890 P.2d 141, 144 (Colo. App. 1994).

---

[7] We could also affirm on the ground that Ewing had a common plan to enter homes through open garage doors, physically assault the inhabitants with a hammer, and sexually assault a female victim, leaving her partially clothed and partially covered by a blanket.  *See People v. Jones*, 2013 CO 59, ¶¶ 24-27 (The trial court properly admitted evidence of alleged sexual assaults against two other women because it showed defendant's common plan "to have sexual relations with white women who had been drinking without their consent late at night while holding their mouths closed."); *People v. Shores*, 2016 COA 129, ¶ 42 (evidence that the defendant engaged in intercourse that caused pain and vaginal injury to older women whose disabilities made them vulnerable constituted a common plan).

¶ 23   Modus operandi evidence is typically used to establish the identity of a perpetrator by demonstrating that the "circumstances attending the commission of the uncharged and charged misdeeds are so distinctive as to establish that only one person — the accused — perpetrated the charged misdeed." *People v. Williams*, 2016 COA 48, ¶ 27 (citation omitted), *aff'd*, 2020 CO 78. "[T]he methods used in the commission of the acts being compared must be both similar to each other *and* dissimilar from the methods generally used in such an offense." *Delgado*, 890 P.2d at 144.

¶ 24   Here, the Aurora evidence and the underlying case shared sufficiently distinctive similarities for the Aurora evidence to constitute modus operandi evidence: (1) the crimes occurred six days apart in adjacent counties at homes abutting open spaces; (2) at each home, the garage door was found open and there were no signs of forced entry; (3) the perpetrator hit each victim in the head repeatedly with a hammer; (4) the perpetrator only took small valuables and dumped out the contents of the women's purses; (5) in each case, the perpetrator sexually assaulted one female victim and left the victims in nearly identical positions — nude from the waist down, lying on their backs with their legs spread apart,

partially covered by a blanket, with their underwear removed and found near their bodies; and (6) the DNA found in the semen left at each crime scene matched Ewing's DNA profile. *See People v. Rath*, 44 P.3d 1033, 1042-43 (Colo. 2002) (the court did not err by admitting modus operandi evidence of four other acts during which the defendant offered his victims a ride or threatened them to get into his car, drove them to a secluded location, and sexually assaulted or attempted to sexually assault them); *People v. McKibben*, 862 P.2d 991, 993-94 (Colo. App. 1993) (the court did not err by admitting modus operandi evidence that the defendant befriended boys, treated them to movies and meals, gave them jobs, took them to his apartment, discussed sexual acts, and then asked the boys for sex); *People v. Ridenour*, 878 P.2d 23, 25, 27-28 (Colo. App. 1994) (other act evidence supported a modus operandi theory when the two crimes involved a robber in a theater who told everyone to lie on the ground, had an earpiece with a wire running under his shirt, and instructed the victims not to call the police for five minutes); *People v. Madonna*, 651 P.2d 378, 386 (Colo. 1982) (the court properly admitted evidence of the defendant's other crime to prove modus operandi when both involved "a bogus telephone

call" to a pharmacist, a forged prescription, and a request that a stranger pick up the prescription).

¶ 25    We are not persuaded otherwise by Ewing's contention that the two crimes did not have the "compelling pattern" or "remarkable similarity" required of modus operandi evidence. We recognize that there were differences in the crimes — for example, the ages of the sex assault victims differed and, in the Aurora crime, Ewing murdered three people and used a knife in addition to a hammer — but "it is not essential that the means of committing the other crimes replicate in all respects the manner in which the crime charged was committed." *People v. Garner*, 806 P.2d 366, 375 (Colo. 1991). Instead, when the evidence of the two crimes is considered in its totality, it "manifest[s] significantly distinctive features to make it more likely than it would be without the other-crime evidence that the person who committed the other crimes also committed the offense charged." *Id.*; *see also Rath*, 44 P.3d at 1042-43 ("Although there were obvious differences in the circumstances surrounding each transaction . . . , they shared a number of significant characteristics that evidenced a pattern of behavior rather than isolated prior incidents.").

14

¶ 26    Nor are we persuaded by Ewing's argument that the methodology used to perpetrate the attacks was not sufficiently distinct from methods generally employed in home invasion burglaries, sexual assaults, and murders. Although, at a certain level of abstraction, one could say that the methods Ewing used are similar to methods typically used in committing such crimes — for instance, many perpetrators of sexual assaults resulting in murder leave their deceased victims partially clothed, and many perpetrators of home invasion murders bludgeon their victims to death — we decline to view the evidence so superficially. Instead, the commonalities between the two crimes are collectively dissimilar enough from traditional methods of committing such offenses that the Aurora evidence was admissible as modus operandi evidence to prove identity. *See Rath*, 44 P.3d at 1042-43; *Delgado*, 890 P.2d at 144.

¶ 27    "While the difference is subtle," because the evidence was admissible as modus operandi, its relevance "does not rest on the prohibited inference that [Ewing] committed the crime charged because he was acting in accordance with a generally bad character." *Delgado*, 890 P.2d at 143-44. Rather, it is Ewing's

15

"tendency to commit an act in a particular way that is relevant, not [his] general character." *Id.* at 144. And although the Aurora evidence certainly implies that Ewing has a bad character, that implication "does not preclude the evidence so long as it is offered for a permissible purpose." *People v. Thompson*, 2018 COA 83, ¶ 60, *aff'd*, 2020 CO 72; *see also Jones*, ¶ 16. We see no abuse of discretion in the district court's determination that the second and third prongs of the *Spoto* test were satisfied. *Yusem*, 210 P.3d at 464; *Jones*, ¶ 16.

  c. The Probative Value of the Aurora Evidence Was Not Substantially Outweighed by the Danger of Unfair Prejudice

The fourth *Spoto* prong asks whether "the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *Spoto*, 795 P.2d at 1318; *see* CRE 403. "[U]nfair prejudice within the meaning of [CRE 403] still refers only to 'an undue tendency on the part of the admissible evidence to suggest a decision made on an improper basis' and does not mean prejudice that results from the legitimate probative force of the evidence." *Rath*, 44 P.3d at 1043 (citation omitted). To conduct the balancing required by CRE 403, we consider factors such as the importance of

16

the material fact for which the evidence is offered and whether it is disputed, the chain of inferences necessary to establish the material fact, the availability of other proof, and the effectiveness of a limiting instruction. *Yusem*, 210 P.3d at 467-69; *see also Rath*, 44 P.3d at 1041. In deference to a trial court's decision to admit the evidence, we assume its maximum probative value and its minimum unfair prejudice. *Yusem*, 210 P.3d at 467.

¶ 29 Whether Ewing was the perpetrator of the victim's sexual assault and murder was a critical and contested material fact. In admitting the Aurora evidence, the district court reasoned that the only evidence linking Ewing to the underlying crimes was DNA evidence that was "over 36 years old," would "undoubtedly be contested at trial," and was "open to argument about contamination or poor storage of the specimen." Under such circumstances, the court determined that the probative value of the Aurora evidence was high and was not substantially outweighed by the danger of unfair prejudice.

¶ 30 Ewing contends that the district court erred by determining that the Aurora evidence satisfied the fourth *Spoto* prong because (1) the DNA evidence "was an efficient means for the prosecution to

prove identity, without also casting the damning innuendo of prejudice into the minds of jurors by injecting the highly inflammatory [Aurora] evidence"; (2) the Aurora crime was more egregious than the charged conduct; and (3) the Aurora evidence was extensive and cumulative and went beyond proving Ewing's identity. For three reasons, we perceive no abuse of discretion in how the court balanced the probative value and prejudicial effect of this evidence.

¶ 31    First, we agree with the court's assessment of the value of the Aurora evidence considering the potential problems with the age, preservation, and testing of the DNA evidence. Defense counsel extensively attacked the DNA evidence at trial, including on the grounds that it had not been properly stored, transmitted, or tested. Indeed, Ewing raises many of those same points on appeal when he argues that the DNA evidence was improperly authenticated. *See infra* Part II.C.3. Under these circumstances, the Aurora evidence was extremely probative and increased the likelihood that Ewing committed the charged crime. *See Rath*, 44 P.3d at 1041 ("Unlike Rule 401's 'relevance,' Rule 403's 'probative value' is not considered in isolation but signifies the 'marginal' or 'incremental' probative

value of evidence relative to the other evidence in the case," so "the court must weigh 'the logical force of the evidence and the proponent's need for the evidence,' in light of other available evidence.") (citations omitted).  And although Ewing was willing to stipulate to the manner of both sex assault victims' deaths, the prosecution was still entitled to prove the elements of its case through "evidence of its own choice."  *People v. Morales*, 2012 COA 2, ¶ 9.  In other words, Ewing cannot "stipulate or admit his way out of the full evidentiary force of the case as the [prosecution] chooses to present it."  *Id.* (alteration in original) (quoting *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997)).

¶ 32      Second, we reject Ewing's argument that the risk of unfair prejudice stemming from the Aurora evidence necessarily outweighed its probative value because it was "significantly more egregious" than the charged crime and thus "likely to inflame the passions of the jury."  Ewing relies on *People v. Brown*, 2014 COA 130M, ¶ 22, to support his argument.  But in that case, the charged conduct involved the defendant videotaping the victim housesitting for him without consent, while the other act evidence "portrayed [the] defendant as a would-be rapist."  *Id.*  Because the charged

19

crime did not involve any physical contact, the division concluded that the other act evidence was "qualitatively different, more severe, and more inflammatory than the evidence concerning the charged offenses," which made it more likely that the jury would render a decision on an improper basis. *Id.* at ¶¶ 22-23. Significantly, however, the division in *Brown* did "not establish[] a categorical rule that a trial court should never admit evidence of other acts that involve conduct that is more serious than the charged offense." *Id.* at ¶ 25.

¶ 33    We acknowledge that the Aurora evidence was extensive and gruesome, and that it involved the rape and murder of a child. We also acknowledge that jurors might be shocked or upset by the evidence. But unlike the other act evidence admitted in *Brown*, the Aurora evidence was qualitatively similar to the evidence of the charged conduct — both sets of evidence concerned violent sexual assaults and murders. In this way, the prejudice resulting from the admission of the evidence was not unfair — that is, the evidence did not have "an undue tendency . . . to suggest a decision made on an improper basis" — but simply resulted "from the legitimate probative force of the evidence." *Rath*, 44 P.3d at 1043 (citation

omitted).  And the potential for unfair prejudice was mitigated by the court's contemporaneous instructions and its final charge to the jury limiting the jury's consideration of the other act evidence to the purpose for which it was admitted.  *People v. Kembel*, 2023 CO 5, ¶ 50 (Contemporaneous instructions to the jury about the limited purpose of other act evidence "suffices to safeguard against the potential for the jury to draw an inference of propensity or to otherwise misuse that evidence."); *People v. McKeel*, 246 P.3d 638, 641 (Colo. 2010) ("We presume that jurors follow the instructions that they receive.").

¶ 34     Third, although substantial evidence regarding the Aurora crime was admitted, we conclude that it was not so extensive that it "caus[ed] the 'side show' to take over the trial," as Ewing argues. Ewing claims that the Aurora evidence "was almost equivalent to" the evidence presented of the underlying crime but does not give us a way to compare relative volume.  And on the record before us, we are not persuaded that the sheer amount of admitted Aurora evidence tips the CRE 403 balance toward reversal.

¶ 35     Ewing also specifically challenges the testimony of the woman who found her son dead, a paramedic who responded to the scene,

21

and a retired detective, as well as the photos of the Aurora crime scene, arguing that this evidence "went beyond establishing Ewing's identity." But through the challenged witnesses, the prosecution established commonalities between the Aurora crime and the charged crime that were necessary for the Aurora evidence to show modus operandi. *See Delgado*, 890 P.2d at 143-44. For example, the woman who found her son dead testified that the family's garage was open and their door unlocked, which is how the victim's home was found. The paramedic testified that the child victim's body had been covered by a blanket when he first arrived on the scene, which is similar to how the victim was found. And the retired detective testified that the Aurora family's home was next to an open space, which is like the victim's home.

¶ 36  That these witnesses testified to other details and background information or became emotional during their testimony does not persuade us that the district court erred by admitting the evidence. The witnesses' testimony was relatively short. *See People v. Underwood*, 53 P.3d 765, 771 (Colo. App. 2002) (the probative value of other act evidence was not substantially outweighed by the danger of unfair prejudice in part because the evidence was

relatively brief). And defense counsel did not object on the basis that the testimony exceeded the scope of admissible CRE 404(b) evidence. *See People v. Howard-Walker*, 2017 COA 81M, ¶ 124 (trial counsel's failure to object was one indication that counsel did not consider the testimony challenged on appeal to be seriously prejudicial), *rev'd on other grounds*, 2019 CO 69.

¶ 37    As to the photos, they depicted the similarities between the crimes, including the victims' similar blunt-force injuries and the sex assault victims' similar body positions. The prosecution did not linger unnecessarily on the photos and redacted any sensitive photos used during its closing argument. And the court mitigated the prejudicial impact of the photos by limiting witness testimony about them and by not allowing the prosecution to publish photos that had already been admitted and were particularly gruesome.

¶ 38    Highly probative evidence "always carries a potential of unfair prejudice," but the district court had the discretion to determine whether the probative value was substantially outweighed by that risk. *People v. McBride*, 228 P.3d 216, 227 (Colo. App. 2009). Affording the Aurora evidence its maximum probative value and

minimum unfair prejudice, we conclude that the court did not abuse that discretion. *See Yusem*, 210 P.3d at 467.

## C.    Authenticity of Exhibits

¶ 39    Ewing contends that the district court erred by admitting the following physical exhibits and the results of the DNA tests performed on them: (1) the blankets that were on top of the sex assault victims and (2) carpet cuttings from underneath the sex assault victims.[8]  Ewing contends that the prosecution failed to authenticate the exhibits.  We conclude that the court did not abuse its discretion by admitting the exhibits or the associated DNA test results.[9]

## 1.    Applicable Law

¶ 40    Authenticity is a threshold requirement for admissibility. *People v. N.T.B.*, 2019 COA 150, ¶ 16; *see also* CRE 901.  This requirement is met by "evidence sufficient to support a finding that

---

[8] Ewing also appears to challenge the admission of photographs of the blankets and the carpet cuttings but fails to develop the argument, so we decline to address it further.  *See People v. Rodriguez-Morelos*, 2022 COA 107M, ¶ 49, *aff'd*, 2025 CO 2.

[9] The People dispute whether Ewing preserved this challenge. Because we conclude that the district court did not abuse its discretion in admitting the evidence, we need not resolve this dispute.

24

the matter in question is what its proponent claims." CRE 901(a). "The burden to authenticate 'is not high — only a prima facie showing is required.'" *Gonzales v. People,* 2020 CO 71, ¶ 27 (quoting *People v. Glover,* 2015 COA 16, ¶ 13). The trial court must assess "whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Glover,* ¶ 13 (quoting *United States v. Hassan,* 742 F.3d 104, 133 (4th Cir. 2014)).

¶ 41 Trial courts have broad discretion "to consider a variety of foundational circumstances depending on the nature of the proffered evidence." *Gonzales,* ¶ 30. "When the proffered evidence is 'unique, readily identifiable and relatively resistant to change,' a witness can authenticate it by identifying the evidence as the item in question." *People v. Rodriguez,* 2022 COA 11, ¶ 16 (quoting *United States v. Cardenas,* 864 F.2d 1528, 1531 (10th Cir. 1989)); *see also* CRE 901(b).

¶ 42 When evidence is not "readily identifiable and is susceptible to alteration by tampering or contamination, the proponent of the evidence must authenticate it by establishing a chain of custody." *Rodriguez,* ¶ 21. Evidence is admissible even when there is some

confusion about the chain of custody "so long as the evidence was accounted for at all times." *People v. Atencio*, 565 P.2d 921, 923 (Colo. 1977). "Whether there is a complete chain of custody of evidence is a question to be determined by the court before it admits the evidence." *Id.* at 924. Once evidence is deemed admissible, "any weakness in the chain of custody is a question of weight for the jury." *Id.*

## 2. Physical Exhibits

¶ 43 The prosecution introduced the Winnie the Pooh blanket that was found partially covering the victim through crime scene investigator Gary Klepper. Klepper testified that he photographed and collected the Winnie the Pooh blanket from the crime scene and took it to the Lakewood Police Department. He said he recognized the blanket based on its Winnie the Pooh pattern, the bloodstains, the markings he placed on it, and his initials on the bag in which it was stored.

¶ 44 The prosecution also introduced the carpet cuttings taken from beneath and around the victim through Klepper. Klepper testified that he collected the carpet from the crime scene and took it to the Lakewood Police Department. He said that he recognized

the carpet based on the markings he drew around the evidence and his initials.

¶ 45    The prosecution introduced the comforter that was found partially covering the child victim through Marvin Brandt, one of the original homicide detectives investigating the Aurora crime. Based on an evidence log, Brandt testified that crime scene investigators took the comforter into evidence at the Aurora Police Department between January 16 and February 17, 1984.  He also testified that he recognized the comforter by its color, floral pattern, and bloodstains.

¶ 46    The prosecution introduced the carpet collected from underneath the child victim through a retired CBI forensic serologist, Jeanne Kilmer.  Kilmer testified that she collected the carpet from the crime scene and recognized it because it had her initials on it.  Kilmer testified that she took the carpet to the lab for testing and returned it to the Aurora Police Department in February 1984.

¶ 47    Ewing contends that the district court erred by admitting the physical exhibits because the prosecution failed to establish that the exhibits were the same items collected from the crime scenes or

were in the same condition as when they were collected. We are not persuaded. The physical exhibits were "unique, readily identifiable and relatively resistant to change," and the witnesses identified the items based on their personal knowledge and recollection of details regarding their appearance. *Rodriguez*, ¶ 16 (quoting *Cardenas*, 864 F.2d at 1531). The witnesses observed and collected the items from the crime scenes, or explained who had done so and when, and testified to their unique characteristics. Thus, we conclude that the prosecution made prima facie showings sufficient to authenticate the blankets and the carpet cuttings. *See Gonzales*, ¶ 27.

### 3. DNA Evidence

¶ 48 Given that the physical exhibits alone did not connect Ewing to the crimes, the thrust of Ewing's argument seems to be that the results of the DNA tests conducted on the physical exhibits should not have been admitted, although he does not articulate that argument very clearly. As best we can tell, he contends that the district court erred by admitting the DNA test results because the prosecution failed to establish a complete chain of custody.

28

¶ 49    CBI analysts Kilmer and Missy Woods[10] testified regarding how evidence generally comes into the possession of CBI.  They explained that local and state law enforcement agencies deliver items of physical evidence to the CBI forensic laboratory for testing.  Such items are assigned a CBI-specific case number and item number, and they are stored in a CBI vault until an analyst conducts tests on them.  For cuttings taken from a large piece of evidence containing potential DNA, analysts place each cutting into an envelope, which is then inserted into a plastic bag and kept frozen.  After completing their examination, analysts seal and return the evidence to the submitting agency.  The lab maintains a log for each item to show who submitted it, when an analyst received it, and to whom it was returned.

¶ 50    Without detailing each witness' testimony about every link in the chain, we are satisfied that the record supports the district court's determination that an adequate chain of custody was established to authenticate the DNA test results.  The law

---

[10] Ewing notes that Missy Woods is being investigated for anomalies in her testing.  Ewing's motion for limited remand related to this issue was denied, so the issue is not before us in this appeal.

enforcement witnesses testified about their participation in collecting and sending the evidence to CBI. The CBI analysts testified that the typical procedures outlined above were followed, that the evidence was tested at the request of a submitting agency, and that they obtained the evidence from and returned the evidence to the lab's evidence room. And the exhibits the prosecution introduced included photos of evidence logs, property tags, envelopes, and bags reflecting the dates the evidence was transmitted and examined. We recognize that there were some ambiguities in the witnesses' testimony regarding the chain of custody of the physical evidence, but such ambiguities went to the weight of the evidence rather than to its admissibility. *See Atencio*, 565 P.2d at 924.

¶ 51    Ewing also argues that the exhibits were not properly maintained because the evidence was "reopened, examined, tested, and repackaged multiple times," which compromised or contaminated any DNA results. But the detectives who examined the evidence testified that they used a sanitized room and wore masks and gloves while handling the items. The analysts also testified that they followed proper procedures during their

examinations, that the exhibits did not appear to have been tampered with, and that the evidence from the two cases was never examined at the same time. Speculation that evidence has been tampered with is not enough to establish a break in the chain of custody. *People v. Valencia*, 257 P.3d 1203, 1206 (Colo. App. 2011) ("[A]bsent any evidence of tampering or lack of authentication, the proponent of the evidence is not required to call each witness who may have handled the item.").

¶ 52      Ewing also argues that the Aurora evidence was contaminated by law enforcement officers vacuuming the carpet and parading a cadet group through the house before the carpet was collected. But he does not suggest that such disturbances prevented law enforcement from collecting the physical evidence or somehow placed his DNA at the Aurora crime scene, so we fail to see how this argument impacts the chain of custody or calls into question the DNA test results. In any event, defense counsel thoroughly explored these issues during trial and argued to the jury that it should discount the prosecution's evidence as a result. *See Gonzales*, ¶ 42 ("[T]he requisite showing under CRE 901(a),

combined with rigorous cross-examination, sufficiently assures accuracy to submit the question of authenticity to the jury.").

¶ 53 In the end, we conclude that the district court did not abuse its discretion by determining that the prosecution made a prima facie showing that the DNA test results were what they purported to be. *See id.* at ¶ 30; *Liggett*, ¶ 16.

### III. The People's Cross-Appeal Arguments

¶ 54 The People contend that the district court erred by (1) dismissing a charge of first degree felony murder predicated on burglary and (2) granting Ewing PSCC. We agree with the first contention but disagree with the second.

### A. Sufficiency of the Information

¶ 55 We disapprove of the district court's ruling dismissing the charge of felony murder predicated on burglary on the ground that the information did not provide Ewing adequate notice.

### 1. Standard of Review and Applicable Law

¶ 56 In a criminal case, the trial court's jurisdiction is invoked by filing a legally sufficient complaint, information, or indictment. *People v. Sims*, 2019 COA 66, ¶ 15. An information provides a defendant with notice of the charged offense and the factual

circumstances surrounding it so that the defendant can prepare an adequate defense.  *People v. Williams*, 984 P.2d 56, 60 (Colo. 1999). It also protects the defendant from further prosecution for the same offense.  *Id.*

¶ 57     "We review the sufficiency of a charge in an information de novo."  *People v. Perez-Hernandez*, 2013 COA 160, ¶ 30.  If the information identifies the essential elements of the crime charged, it is substantively sufficient.  *People v. Melillo*, 25 P.3d 769, 778 (Colo. 2001).  A failure to specify an underlying offense — what Ewing alleges occurred here — is a defect in form, not substance.  *See Williams*, 984 P.2d at 61-62 (explaining that subsequent statutory amendments altered the pleading specificity required by prior case law); *People v. Auman*, 67 P.3d 741, 750 (Colo. App. 2002), *rev'd on other grounds*, 109 P.3d 647 (Colo. 2005).

¶ 58     Although objections to the form of an information are waived if not made before trial, *Williams*, 984 P.2d at 64, such "a defect . . . may render a conviction void if the defect substantially prejudices rights of the defendant," *Auman*, 67 P.3d at 751.  To determine whether the defendant was prejudiced, we consider the surrounding

circumstances, including the context of the other counts.

*Esquivel-Castillo v. People*, 2016 CO 7, ¶¶ 17-18.

### 2. Additional Background

¶ 59    In count 3 of the information, the prosecution charged Ewing

with first degree felony murder predicated on burglary:

> On or about January 10, 1984, Alex
> Christopher Ewing unlawfully and feloniously,
> acting alone or with one or more persons,
> committed or attempted to commit burglary
> and, in the course of or in furtherance of that
> crime, or in the immediate flight therefrom,
> the death of [the victim], a person, other than
> one of the participants, was caused by anyone;
> in violation of section 18-3-102(1)(b), C.R.S.

¶ 60    At the jury instruction conference, the prosecution asked the

court to instruct the jury that the crime underlying the burglary

predicate was theft or sexual assault.  In response, Ewing moved to

dismiss count 3 because it failed to put him on notice of the

underlying crimes or the intended victim, which he argued divested

the district court of jurisdiction.[11]  The court dismissed count 3,

reasoning that Ewing could not determine "the basis of the burglary

---

[11] The prosecution did not charge Ewing with burglary because that
charge was barred by the statute of limitations.

34

charge . . . just [by] looking at . . . the charge, the facts, [and] the police report."

### 3. Analysis

¶ 61 The People contend that the district court erred by dismissing count 3 because the prosecution was not required to specify the offenses underlying the burglary predicate and Ewing was not prejudiced by any lack of particularity. Even if we assume that the information was deficient in form, we perceive no prejudice to Ewing that would have justified dismissing count 3. *See Auman*, 67 P.3d at 750; *Esquivel-Castillo*, ¶¶ 17-18.

¶ 62 To obtain a conviction on count 3, the prosecution had to prove that Ewing knowingly entered or remained unlawfully in a building or occupied structure with the intent to commit a crime other than trespass — in this case, theft or sexual assault — against a person. *See* § 18-4-202(1), C.R.S. 1984. The underlying case had only one victim, and the charged conduct occurred on a single day and involved entry into a single residence. Ewing had ample notice of the victim, the date, and the building he was alleged to have burgled.

¶ 63    Even so, the district court determined that Ewing lacked notice that he could be convicted of burglary based on theft or sexual assault.  But the prosecution charged Ewing with felony murder predicated on sexual assault.  So Ewing undoubtedly had notice that he was alleged to have sexually assaulted the victim. *See Williams*, 984 P.2d at 60 (an information is sufficient when it provides defendant notice of the factual circumstances surrounding the offense so that he can adequately defend himself).  And the prosecution separately charged Ewing with felony murder predicated on robbery.  So Ewing had notice that he was alleged to have knowingly taken a thing of value from the victim "by the use of force, threats, or intimidation." § 18-4-301(1), C.R.S. 1984. Although theft requires knowingly obtaining or exercising control over a thing of value "without authorization, or by threat or deception," § 18-4-401(1), C.R.S. 1984, rather than "by the use of force, threats, or intimidation," § 18-4-301(1), C.R.S. 1984, Ewing had sufficient notice of the relevant allegations by virtue of the felony murder (robbery) charge.  *See Williams*, 984 P.2d at 60.

¶ 64    Based on the other charges and the circumstances of the case, Ewing had sufficient notice of the crimes of theft and sexual assault

36

underlying the charge of felony murder predicated on burglary. Because Ewing would have suffered no prejudice from the alleged defect in the form of the information, we disapprove of the court's dismissal of count 3. *See People v. Moore*, 226 P.3d 1076, 1092 (Colo. App. 2009) (because jeopardy attached, we can only approve or disapprove of the court's ruling); *see also* § 16-12-102(1), C.R.S. 2024 (authorizing the prosecution to appeal a question of law).

### B. Presentence Confinement Credit (PSCC)

¶ 65 The People contend that the district court erred by awarding Ewing PSCC from the date the arrest warrant for this case was issued until he was sentenced. We are not persuaded.

#### 1. Standard of Review

¶ 66 We review de novo whether a trial court properly awarded PSCC. *Fransua v. People*, 2019 CO 96, ¶ 11. We also interpret statutes de novo. *People v. Padilla-Lopez*, 2012 CO 49, ¶ 7.

#### 2. Applicable Law

¶ 67 Under section 18-1.3-405, C.R.S. 2024, any person "confined for an offense prior to the imposition of sentence for said offense is entitled to credit against the term of [their] sentence for the entire period of such confinement." A defendant is only entitled to such

credit when "the presentence confinement [was] *actually caused* by the charge or conduct for which the defendant is to be sentenced." *Russell v. People*, 2020 CO 37, ¶ 22 (citation omitted).

¶ 68     In this context, we apply the "substantial nexus test" to assess causation. *Id.* at ¶ 24. "[A] substantial nexus exists where the defendant would have *remained confined* on the charge or conduct for which credit is sought *in the absence* of any other charge." *Id.* It does not require that the charge or conduct for which the sentence is to be imposed is the *exclusive* cause of confinement. *Id.* at ¶ 22. "Put another way, the court should ask 'what would happen if *only* the sentencing charge existed; in such a scenario, would the defendant have remained confined?'" *Id.* at ¶ 24 (citation omitted). If the answer is yes, a "defendant is entitled to PSCC so long as the credit would not be duplicative." *Id.*

¶ 69     A defendant may be confined on charges from multiple jurisdictions but can only be physically confined in one jurisdiction at a time. *Id.* at ¶ 25. In such a scenario, the confinement "may be *caused* by the charges in both jurisdictions," such that the defendant may be entitled to nonduplicative PSCC. *Id.*

¶ 70    Section 18-1.3-405 provides that "[i]f a defendant is serving a sentence or is on parole for a previous offense when he . . . commits a new offense and he . . . continues to serve the sentence for the previous offense while charges on the new offense are pending," then the defendant is only entitled to a credit against his original sentence.  *See also Russell*, ¶¶ 26-27.

### 3.    Additional Background

¶ 71    On February 28, 1985, a Nevada jury convicted Ewing of two counts of attempted murder with the use of a deadly weapon and burglary for attacking a couple in their home.  The Nevada court sentenced Ewing to seventy years.

¶ 72    In 2018, while he was serving his sentence in Nevada, Ewing's DNA was collected and uploaded to a national database.  It matched the DNA profiles on the blanket, the carpet, and the samples taken from the victim's body.  As a result, a warrant for Ewing's arrest in this case was issued on August 9, 2018.

### 4.    Analysis

¶ 73    The People contend that the district court erred by awarding Ewing PSCC of 1,342 days — the number of days between August 9, 2018, the date the arrest warrant was issued, and April 12,

2022, the date he was sentenced — because the credit was duplicative of credit he was already receiving against his Nevada sentence.[12]  For two reasons, we are not persuaded.

¶ 74    First, from the date the warrant was issued forward, Ewing would have been confined on the charges in this case regardless of whether he was also confined on other charges in another jurisdiction.  Thus, a substantial nexus exists between the charges in this case and Ewing's presentence confinement.  *See Russell*, ¶ 24.

¶ 75    Second, section 18-1.3-405 provides that if the defendant commits a *new crime* while serving a sentence for a previous offense, PSCC is to be credited against the sentence the defendant continues to serve for the previous offense, rather than against the sentence on the new offense.  *Russell*, ¶ 26.  But Ewing committed the underlying crime *before* he was sentenced in Nevada, not while he was serving that sentence, so the circumstances described in the statute do not apply.  *See* § 18-1.3-405.  The supreme court has cautioned that, "[i]n circumstances not covered explicitly by the

---

[12] The People do not argue that the PSCC awarded in this case duplicates any PSCC awarded in the Aurora case.

40

statute, courts should take care when sentencing to give the defendant a day of credit . . . for each day he was confined prior to sentencing." *Russell*, ¶ 26.

¶ 76 Accordingly, we perceive no error by the district court in awarding Ewing PSCC. *See id.* at ¶¶ 22-27; § 18-1.3-405.

## IV. Disposition

¶ 77 We affirm the judgment of conviction, disapprove of the district court's dismissal of the felony murder (burglary) charge, and affirm the court's award of PSCC.

JUDGE J. JONES and JUDGE YUN concur.